AXELRAD, J.T.C.
In this matter taxpayer seeks a reduction in its local property tax assessments for the 1995 and 1996 tax years, for its community shopping center known as “Laneco Plaza.” The subject property is located at 1 Pittstown Road, Franklin Township, Hunterdon County, New Jersey (Block 5, Lot 20) on 36.51 acres in a commercial zone.
The subject property was assessed for each of the tax years as follows:
Land $ 2,000,000
Improvement 14,000,000
Total $16,000,000
The relevant common level ratios of assessment to true value of the Director of the Division of Taxation for Franklin Township pursuant to NJ.S.A. 54:1-35.1, commonly known as “Chapter 123”, are 97.40% and 100% for the 1995 and 1996 tax years, respectively. Taxpayer’s expert contends that the fair market value of the subject property as of October 1,1994, and October 1, *238 1995, was $10,000,000, while municipality’s expert concluded a fair market value of $17,000,000.
The subject property is located at the northern tip of Franklin Township, a predominantly rural community, just south of the town of Clinton. The subject is located on the southeast side of Pittstown Road, designated as County Road 513 (“CR 513”), immediately south of 1-78, although there is no direct access to and from 1-78.
The subject improvements include a community shopping center consisting of three separate one-story buildings totaling approximately 227,200 square feet of rentable area, comprised of a 59,200 square foot supermarket, an 88,200 square foot junior department store and 79,800 square feet in small retail stores throughout the center, including a bank.
The shopping center was constructed in stages from 1971 through 1989. Taxpayer developed the site to take advantage of its natural contours, resulting in a two tier development pattern on a steep incline. The topography slopes upward above road grade to a plateau and then rises to a separate plateau. The lower level is approximately twenty to twenty five feet above street grade. The northern portion contains a 114,500 square foot building constructed in 1971, comprised of a Laneco discount department store and eight small retail satellite stores (Building “A”). There is a parking lot and a 21,600 square foot retail and small business building, anchored by a bank, constructed in 1989 on the northeastern portion (Building “B”). The second tier, or southern portion of the site, was leveled at approximately ten to twenty feet higher than the lower tier and in 1989/90 was developed with an anchor “Laneco” supermarket building connected at a right angle to retail stores. The combined rentable square footage of such supermarket and retail stores (cumulatively Building “C”) is approximately 91,100. There are no paths, walkways, stairways or ramps connecting the levels; a patron must travel by ear to each tier.
Access to the property is from CR 513, by way of two-way driveways located at each end of the property. The northerly driveway is part of a traffic light controlled intersection which forms part of the eastbound ramp to 1-78, although the subject *239 does not have direct access to and from the Interstate. The access road comes in behind the department store, bisects the site and winds up to the front of the supermarket/satellite stores and down to the original driveway to the retail strip and department stores. The other driveway lies at the southerly end of the property and accesses the retail strip stores and winds to the department store on the first level and up to the supermarket and satellite stores. Located at each driveway at road grade are signs designating “entrances” but no signs identifying any of the stores.
The signage on the store fronts is not visible until a patron turns into each level of the shopping center. The only other signage permitted as of the valuation dates was a double-faced, twenty foot high pylon containing a sign approximately five feet long by fifteen feet wide, illuminated at night, with red lettering on a white background identifying the center as “Laneco Plaza”, visible from CR 513, the traffic controlled intersection and 1-78.
Due to the topography and configuration of the site, very little, if any of the buildings can be seen from CR 513 and only the rear of the supermarket is visible from 1-78. Furthermore, the retail stores are not visible until a patron physically enters the shopping center, and, even then, the majority of the satellite stores are hidden from view by the supermarket.
Both parties’ experts agree that the highest and best use of the property is its current use as a community shopping center. Taxpayer’s expert relied predominantly on the income approach to value and secondarily on the market approach. He then utilized the cost approach to support the value conclusions indicated by the other two approaches. Municipality’s assessor set the assessment for the 1995 tax year in primary reliance upon its expert’s summary appraisal report of December 13, 1994 (“first report”), limited to the income approach, concluding a market value of $16,100,000. This report was provided in discovery to taxpayer as municipality’s report, and was admitted into evidence over the objection of municipality’s counsel. Pursuant to a scheduling order, municipality was provided an opportunity to file any “amendment” to this appraisal report which it did by report dated *240 May 6, 1996 (“second report”). This report utilized all three approaches to value, with the most weight placed on the income approach and secondary weight placed on the market data approach. The cost approach was relied upon to support the value conclusions indicated by the other two approaches.
The record demonstrates that on September 4,1996 the subject shopping center was sold to National Project Resources, L.P. for $9,155,000, pursuant to a sales agreement dated September 11, 1995. Municipality’s expert ignored the sale in his valuation of the subject property. Taxpayer’s expert testified that he included the sales information in his report for “historical purposes” but acknowledged that he gave no weight to it. Accordingly, the court has not given any weight to the sale as an indication of value of the subject shopping center.
Due to the absence of comparable market data contained in the record, the sales comparison approach is not probative of the subject property’s true value and is, thus, rejected by the court. Taxpayer’s expert himself classified Laneco Plaza as “one of a kind in the area” due to its large size and lack of comparable community shopping center sales in Hunterdon County, which necessitated consideration of sales as far away as Bergen and Ocean Counties. The municipality’s expert acknowledged that sales would be located in more urban areas and would require speculative adjustments. As a further indication of the difficulty in locating comparable sales, taxpayer’s appraiser chose as one of his comparables a one-story shopping center with improvements and acreage only 15% of the size of the subject.
Unlike residential property, or even some office buildings, there are few shopping centers to which the Market Comparison Approach can be applied. Sales of similar shopping centers are not available, not because of lack of market demand but because centers are not similar ...
Among neighborhood centers, some similarities may exist, for these usually contain supermarkets and drugstores with a small trade area. Neighborhood centers can be compared to some extent, but in every case differences exist with respect to lease terms, construction costs, and operating expenses. In neighborhood centers, as in regional centers, the Income Approach is the final determinant of value, and the Market Comparison Approach is of limited use.
*241 [Gabrellian & Jessourian Assocs. v. Oakland Borough, 11 N.J. Tax 310, 315 (Tax.1990) (citing Hoyt, “Appraisal of Shopping Centers,” in Encyclopedia of Beal Estate Appraising, Third Edition (Edith J. Friedman ed., 1978)).]
In this case neither expert provided any data regarding the factors cited above, or the absence or presence of competition, cost of construction or financing terms of the sales. In addition, neither expert reviewed the leases or was familiar with their terms, relying predominantly upon information obtained second hand. Both appraisers relied upon the sale of Chester Plaza (Route 206, Morris County), which contains a Shop Rite, bank, drug store and 20-30 satellite stores purportedly “similar to Laneco”, although neither considered any of these stores for deriving market rent under the income approach. As a result, the court concluded that the appraisers themselves were not convinced that Chester Plaza was a comparable shopping center. The other common sale was the Caldor Center in Hamilton Township, Mercer County, which is not a competitive market with the subject.
Furthermore, both experts recognized that the cost approach is inapplicable as an independent basis for determination of value of the subject site, since it is less reliable with older improvements and there is inadequate data available to measure depreciation and establish land value.
The court finds that for this investment grade, income-producing property, the income approach is the appropriate method of valuation. “It is well settled that the income capitalization approach is the preferred method for determining the taxable value of income-producing property.” Harrison Realty Corp. v. Harrison, 16 N.J. Tax 375, 382 aff'd per curiam, 17 N.J. Tax 174 (App.Div.1997). See also Pine Plaza Assocs. v. Hanover Tp., 16 N.J.Tax 194, 200 (Tax 1996); Appraisal Institute, The Appraisal of Real Estate 449 (11th ed.1996). The court will determine the value of the subject community shopping center using this approach.

SUPERMARKET

Both experts compared the 59,200 square foot Laneco supermarket building to other anchor supermarkets in community *242 and strip shopping centers. The primary difference between the experts was in adjustments involving location, access and visibility. Taxpayer’s expert made adjustments for the lack of visibility of the subject property and the difficult and confusing access, resulting in an estimated net market rent of $7.50 per square foot for the subject supermarket. In his pre-litigation report, municipality’s expert expressly concluded that a “substantial location adjustment” was appropriate since the improvements had “little visibility to the traveling public and no exposure to through traffic”, the site “is slightly off the beaten track [while] all of the [comparable]rentals have highway location” and “the site is less than ideal since access could be confusing if one is unfamiliar with the area”, indicating an almost identical net market rental for the Laneco food store of $7.90 per square foot. The choice and analysis of the comparables referred to by municipality’s appraiser in his first report clearly indicate he considered the visibility of passing traffic and ease in accessing a site as major factors in estimating the value of retail space and as significant portions of his “location” adjustment.[1]
In municipality’s expert’s second report, prepared specifically for the litigation, however, he took a complete about-face without convincing explanation and made no adjustments of that type to the same three comparables, concluding a significantly higher net market rent of $10.25 per square foot for the Laneco supermarket.[2] Although the appraiser acknowledged that the location, access and visibility of the rental comparables had not changed in the interim, for some unknown reason and without apparent justification, he deleted any reference to the narrative discussion of those concerns from his second report, other than a singular *243 acknowledgement that “the improvements have little visibility to the traveling public.” Instead, in direct contradiction to his prior report, his description of the subject property’s location in the second appraisal was that it had “good access over uncrowded county roads and is easily accessed from 1-78/22. It also can be accessed from Route 31 easily, if one is familiar with the area.”
One of the most obvious examples of the inconsistent analyses of municipality’s appraiser involves the 40,900 square foot Shop Rite lease at Arrow Mill Plaza on Route 31 in Clinton, Hunterdon County, relied on in all three reports and acknowledged by both experts to be the property most comparable to the subject. Since the Shop Rite was at road grade and had immediate access from well traveled Route 31, taxpayer’s appraiser applied a -20% access/visibility adjustment along with a -5% size adjustment, and concluded a net rental of $7.69 per square foot. In his initial report, municipality’s appraiser applied a -25% adjustment to this lease on the basis that it had a “highway location” which was superior to that of the subject. He also applied a -25% adjustment to the retail satellite lease designated as comparable number six (Tirpok Cleaners) which was also located in the Arrow Mill Plaza, asserting it was a “better located rental [since] it has exposure to the traveling public and has a less confusing entrance.” In his second appraisal, however, municipality’s appraiser removed the entire location adjustment to Arrow Mill Plaza, concluding an unadjusted net rental of $10.25 per square foot for the subject supermarket. His analysis in the second report was that the location of the Shop Rite was comparable to the subject, as it did not have “good visibility. Route 31... is a heavily traveled road which makes it difficult to access and exit from the southbound lane.”
Municipality’s appraiser also dramatically changed his position in the second report regarding two other previously relied upon comparables. He deleted the entire -25% location adjustment for the A & P Supermarket in Somerset Plaza, although he acknowledged in the narrative that the comparable may be slightly better located than the subject. He further deleted all but *244 -5% of Ms prior -25% adjustment to the Kings Supermarket on Route 24 in Mendham on the basis that the comparable was m an upscale commumty, without any mention of its superior exposure and access.
The court did not find the photographs of either expert’s comparables to be persuasive evidence nor the hypotheticals posed by muMeipality’s counsel to have any probative value, as they did not demonstrate the superiority or inferiority of the subject’s access and/or location. The court finds that taxpayer’s lease comparables are situated on Mghways, with direct exposure to potential patrons through visible, identifying signs and/or buildings, and have reasonable access directly from the traveling roadways. TMs conclusion is based on the observations, analyses and conclusions of taxpayer’s appraiser and iMtially by mumcipality’s appraiser and Ms staff, and further acknowledged by the assessor.
On the other hand, the subject property is not a typical community shopping center. It has neither adequate visibility of its buildings nor visibility of any of the signs of the stores from the interstate, county and entrance roads. Furthermore, the site is not readily accessible from those roadways nor are the approaches to the various stores easily negotiable from the winding, sloping, internal roads. As observed by all three of taxpayer’s witnesses, Laneco Plaza is essentially two distinct shopping centers due to the topography and uMque bi-level, above-grade configuration. The combination of these factors places Laneco Plaza at a disadvantage as compared to competitive commumty shopping centers and has a significant negative impact on the subject’s attractiveness to tenants and the rents wMch it can command.
The court also finds the 45,000 square foot Shop Rite, located on Routes 202 and 31 in Raritan Township, Hunterdon County, relied upon by taxpayer’s expert to be comparable and finds the expert’s access/visibility and size adjustments to be appropriate. The two A & P stores located in Warren County are also comparable leases. Although mumcipality’s counsel urges the court to disregard the latter two leases as ‘Warren County is simply not a *245 comparable demographic area to Hunterdon County,” it is interesting to note that municipality’s appraiser himself used one of those stores, i.e. the White Township Plaza A & P, as a comparable in his initial report, applying the same +10% demographic adjustment as taxpayer’s appraiser. Municipality’s appraiser chose not to use this property as a comparable in his second report,, presumably because its net rental was substantially below his concluded range, replacing it with a Kings Supermarket fronting on Routes 202 and 206 and located near a huge townhouse and condominium development in a “more upscale community” in Somerset County, which he adjusted by only —10% for location.
The court finds the selection and analysis of comparable supermarket rentals by taxpayer’s expert to be more credible, consistent and better reasoned. The available market data in the record indicates that $7.50 per square foot represents a reasonable estimation of market rent for the subject supermarket.
The court understands that municipality’s preliminary report may have been rough. It may not have included as much data as the final report, and may have required refining adjustments and consideration of additional approaches. The court, however, would expect an expert’s observations of a number of the most important factors of a retail site, i.e. location/ access/ visibility, as well as his narrative summary and nature of adjustments, to be consistent with, or at least similar to, the final appraisal. If not, the court would expect a cogent explanation setting forth the reasons for the inconsistency. The purported “time constraints” on municipality’s appraiser for preparation of the summary report is not a plausible explanation for the glaring contradictions between the two reports. In addition, he should have been familiar with the subject property, as well as the comparables, since he and his firm performed the revaluation of the municipality for an earlier tax year.

DISCOUNT DEPARTMENT STORE

Taxpayer’s appraiser estimated an economic rent for the 88,134 square foot department store of $4.50 per square foot. In *246 Ms imtial report municipality’s appraiser concluded $5.53 per square foot for the discount department store, erroneously estimatmg a significantly Mgher square footage of 103,561 square feet, while in Ms second report he increased the unit rental to $6.25 and decreased the square footage to 88,200. Both experts recognized that construction costs of a discount department store would be less than a supermarket and that a downward size adjustment would also be appropriate since larger space typically leases at a lower rental per square foot. Taxpayer’s expert, and mumcipality’s expert in Ms imtial report, adjusted their respective supermarket rentals of $7.50 per square foot and $7.90 per square foot by -20% for fit-up costs, -10% for size, and taxpayer’s expert included a —10% adjustment for age/condition. Taxpayer’s expert tested tMs analysis against Ms rental designated as number five located at Warren Plaza, Washington TownsMp, Warren County, containing a 34,154 square foot Five Star Values discount department store having an average net rent of $5.70 per square foot, wMch he adjusted -15% for size and -10% for aecessAocation, resulting in a umt rent of $4.36 per square foot.
In Ms second report, mumcipality’s expert deleted Ms calculation based on supermarket rentals, although he derived Ms discount store rental estimate with primary reliance upon the Arrow Mill Shop Rite, adjusting the $10.25 rental by —10% for fit-up, — 5% for condition and —25% for size. He compared that with (1) the 33,000 square foot Unclaimed Freight building, a former supermarket converted to retail, located in Franklin TownsMp, designated as comparable number five, reducing the $9.00 per square foot rental by —25% for size, and (2) the 119,935 square foot Caldor located in Hamilton TownsMp, Mercer County, designated as comparable number six, to wMch he made no adjustment to the $6.80 per square foot rental. He estimated the subject department store to have a rental value similar to the Shop Rite comparable but less than the latter two retail stores.
The court cannot accept the $6.25 per square foot conclusion of mumcipality’s appraiser, since Ms analysis of the Arrow Mill Shop Rite does not include the —25% location/ access adjust *247 ment applied to the lease in his initial report, which the court has concluded to be an appropriate adjustment. This adjustment alone would reduce the rental upon which he placed primary reliance to $4.93 per square foot. Furthermore, the high end of his range could only be $5.06 per square foot since Unclaimed Freight is in the same location as Somerset Plaza A & P, designated as comparable four, to which he applied a -25% location adjustment in his first report. The court does not consider the Caldor rental as entitled to much weight because the appraiser never saw the lease and had no knowledge of its inception date, term, lease type and options. Additionally, the Caldor Center on Route 33 in Hamilton Township, Mercer County is not an appropriate comparable for Franklin Township, Hunter-don County, even though it was also used by taxpayer’s appraiser as a sales comparable. It is located 3/4 of an hour away from the subject, on the outskirts of Trenton, which is not a competitive market with the subject in density or demographics. Based on the record the court finds the lease analysis of taxpayer’s expert of the large retail stores to be more credible. As such, the court will accept taxpayer’s projected unit rental of $4.50 per square foot for the subject department store.

BANK BUILDING

For an unexplained reason, taxpayer’s appraiser completely ignored the presence of a bank at the subject premises. He did not calculate the rental of the 2,664 square foot Phillipsburg National Bank building as a separate category, but rather included it as a component of the satellite stores.[3] The bank is an anchor *248 on the southern corner of the 21,600 square foot retail building designated as building “B” on the first level of the subject property. The court finds that a bank with drive-thru window and night depository improvements must be compared to other bank leases in order to ascertain the appropriate fair market rental.
Municipality’s expert identified an adequate number of bank branch leases to determine a market rental for the subject under the income approach. See United Jersey Bank v. Lincoln Park Bor., 11 N.J. Tax 549 (Tax 1991). Although he included this building with the small retail space in his initial report, the court does not find that to be an inconsistency with his second report. Upon further analysis and reflection, the expert apparently took the time to locate two comparable bank properties in shopping malls. Municipality’s expert submitted as a comparable a former 4,500 square foot National Westminster Bank with a drive-thru located as an end unit in the Hunterdon Shopping Center, about eleven miles south of the subject, and a 2,400 square foot Midlantic Bank building located next to the Clinton Shop Rite in the Arrow Mill Shopping Center. He applied a -10% location adjustment to the Hunterdon Shopping Center building because it faced Rt. 202, was located in the county seat and was “better located than the subject,” resulting in a net rental of $26.50 per square foot. The only adjustment he made to the Arrow Mill Shopping Center budding was due to the lack of a drive-thru, resulting in a net rental of $29.05 per square foot. As previously discussed, a —25% adjustment for “location/access” would appear to have been appropriate to the latter comparable, resulting in a net rental of $21.78 per square foot. That omission, however, would not impact on the estimate of value of municipality’s expert, since his conclusion of $25 per square foot is within the range of market rents and is consistent with the contract rent. The court finds $25 per square foot to be the appropriate economic rent for the bank.

PHARMACY

Taxpayer’s expert considered “pharmacy” as a separate category of comparable, when in fact there never was, on the *249 assessing dates, fitted-out pharmacy space at the subject property. Additionally, the only free-standing pharmacy comparable utilized by taxpayer’s expert was a CVS in Warren County designated as rent comparable 9A; his comparable IB was actually the interior portion of the overall Clinton Shop Rite designated as 1A, and clearly would not have been an appropriate comparable for a separate pharmacy store. The other two stores which the expert used as comparable were not comparable uses. As a result, the area attributable to the pharmacy by taxpayer’s expert will be considered as part of the satellite stores.

SATELLITE STORES (SMALL RETAIL/OFFICE)

As of the valuation dates, there were approximately thirty small retail and office satellite stores in the three buildings, excluding the bank, totaling 77,136 square feet. Taxpayer’s appraiser relied upon the léases of: a laundromat located in the Shop Rite center in Raritan Township, Hunterdon County, designated as 2B; a restaurant and video store in a strip center without an anchor on Route 22 in Readington, Hunterdon County, designated as 8A and B; and a car wash in Mansfield Township, Warren County, approximately twenty miles from the subject, designated as 9B. He concluded a market rent of $10 per square foot for the subject satellite stores. Taxpayer’s appraiser did not provide any explanation for his inconsistent access/visibility adjustment of the car wash lease in his satellite analysis ( — 25%) and of the CVS at the same location in his pharmacy analysis (-20%).
Municipality’s appraiser initially concluded a market rent of $14 per square foot. In his second report he reduced this figure to $12 per square foot, based upon: nine rentals in an anchored shopping mall also on Route 22 in Readington, designated as one to nine; five assorted retail leases in Clinton not far from the subject property, designated as ten to fourteen; three office leases within two miles of the subject property, designated as fifteen to seventeen, and the contract rent of the subject stores. The court finds that the retail and office leases chosen by municipality’s expert are closer in location to the subject and appear to be within *250 the competitive market of the Laneco Plaza stores. As such, $12 per square foot is the appropriate economic rent for the satellite space at the subject shopping center.

MANAGEMENT OF CENTER/VACANCY AND COLLECTION

Counsel for the municipality asserts that the testimony of taxpayer’s witnesses clearly evidenced a persistent pattern of bad management, which negatively impacted on the rentals and overall value of the shopping center. There is nothing in the record to demonstrate anything less than ordinary competent management. Furthermore, it is apparent that municipality’s expert did not consider the management of the center to have any causal influence on its occupancy and collections. Even though as of the valuation dates the subject property had an overall vacancy rate of approximately 18%, municipality’s appraiser stipulated to a 12% vacancy and collection loss.
The improvements were adequately maintained and portions had been recently renovated. Taxpayer had a coherent marketing plan and made efforts to attract new tenants. The credible testimony of George Buchanan, the Senior Vice President of Administration of taxpayer’s parent company, who was directly responsible for the management of Laneco Plaza, was that vacancy and collection problems existed primarily due to the configuration of the site, notwithstanding taxpayer’s aggressive measures to lease the vacant space and take appropriate eviction measures against delinquent tenants. Absolutely no evidence was presented to substantiate the allegation by municipality’s counsel that “management was purposely undermining the Laneco building as part of plan to force the one remaining restaurant user, Pizza Como, out [in order to] make the space available to a tenant of National Resources,” the subsequent purchaser. According to the testimony of National’s president, Richard Baker, when he entered into the contract of sale in September, 1995, the pizza restaurant lessee had not paid rent, taxes, or CAM charges for several years.
*251 According to Buchanan, taxpayer always marketed sites on its own. Due to the subject’s vacancy problems, however, it used a commercial realtor for this property since 1989. Taxpayer merchandised the anchor department store with overstocked items from other Laneco stores until December of 1995 in order to keep it viable and did not put a “closing” sign on its front window until that time. Furthermore, taxpayer’s agents contacted several known discount chains to fill the space and began negotiations with Jamesway until its bankruptcy.
Collections were a problem from the beginning. Buchanan was in constant contact with the tenants and made deals with them to collect back rent. Since it is more difficult to lease space in a “dead” center, he made an appropriate management decision to let the slow payers and non payers remain until a new tenant was available. Many of these facts were corroborated by Baker. The court is not convinced by the arguments of municipality’s counsel and finds the center was appropriately managed.

EXPENSES

Taxpayer’s expert estimated expenses of $249,806, while the estimated expenses of municipality’s expert were slightly higher at $269,390. Both experts considered the unreimbursed real estate taxes as an expense, with taxpayer’s appraiser estimated them at $25,000 and municipality’s appraiser utilizing $39,936. The court will accept the latter’s calculation as more accurate, based upon the actual 1995 taxes of $337,600 and the 12% vacancy/collection loss allowance.
Both experts projected a total fee of 10% of effective gross income for management, professional services and commissions. Municipality’s expert assumed this expense would be passed though to the tenants and reduced the allowance, but there was no evidence presented to substantiate this position. The court concludes that 10% of effective gross income, without adjustment for vacancy, is the appropriate expense for this category. *252 Taxpayer’s expert projected structural repairs and reserves at $ .25/sf of gross building area while municipality’s expert projected a higher expense based upon 5% of effective gross income. The court will accept the estimate of taxpayer’s expert as being within the appropriate range and consistent with industry standards.
Both experts’ unreimbursed common area operating expenses were similar. Since the expenses increased 5% from 1993 to 1994, the court will accept the methodology of taxpayer’s appraiser, in which he increased the 1994 figure by 5% to project “stabilized” expenses for 1995, based upon the history of the subject. He applied the 12% vacancy and collection loss to that number and arrived at $24,560 unreimbursed common area expenses.

CAPITALIZATION RATE

Both experts utilized the Band of Investment method of calculating the capitalization rate, using a 70% debt to 30% equity ratio and a 9.75% interest rate. Taxpayer’s expert derived a 13% return on equity while municipality’s expert used 11.56%. Taxpayer’s expert concluded a capitalization rate of 11.87%, while municipality’s expert concluded a rate of 10.29%, which he reduced to 10% based on the market-derived rate.
The most obvious difference between the experts’ conclusions was that municipality’s expert used the mortgage interest rate rather than the mortgage constant although he acknowledged he would use a mortgage constant if preparing a report as of the trial date. The “modified band of investment methodology” previously used by the Appraisal Institute which utilized the “mortgage interest” component, resulted in an interest rate which did not include a provision for recapture of invested capital. See, e.g., Appraisal Institute, The Appraisal of Real Estate 325 (6th ed.1973). As a result, this formula was revised quite some time ago to include the mortgage constant as the capitalization rate for debt, which calculates both the return on the investment and of *253 the investment. See Appraisal Institute, The Appraisal of Real Estate 517-518 (11th ed.1996). Thus, the calculation by municipality’s expert is skewed as a result of his improper use of mortgage interest, and has been given very little weight in the court’s analysis.
Neither is the court satisfied that the 13% return on equity rate and resulting capitalization rate utilized by taxpayer’s expert accurately reflect the retail market for community shopping centers as of either date of valuation. In reality, the substantial premium which he added for management risk caused by poor visibility and access, and problems with configuration of the improvements, has been, to a large extent, already taken into account in the calculation of the market rents for the various types of stores. The objective evidence indicates that, for the third and fourth quarters of 1994, the free and clear equity capitalization rates for regional malls ranged from 6.25-11%, with an average of 7.73% (Appraiser News) and for national strip shopping center markets ranged from 8.5-11% with an average of 9.69% (Korpacz). The ACLI tables indicate an average capitalization rate of 9.7% for retail loans from $5,000,000 — $14,999,000, 10% for $15,-000,000 — $24,999,000, and 9.8% for all Middle Atlantic retail loans. The capitalization rates remained consistent throughout 1995, with neighborhood/community retail investments for the fourth quarter ranging from 9-9.5% (RERC). Taking into consideration that the subject is not a newer, prime investment grade property, is not as desirable as a regional mall, and allowing some premium for risk and lack of liquidity, the court finds 10.25% to be an appropriate capitalization rate well within the market derived range.

ADDITIONAL LAND

It is undisputed that the subject property had received prior planning board approval for an additional 36,180 square feet of retail space which had not been built and that there was sufficient sewer capacity for such expansion. Municipality’s appraiser added $156,000 to his value derived from the income approach as excess land value. Taxpayer’s appraiser asserted that, based *254 upon the insufficient demand for the retail space already built and the speculative nature of such expansion, there was no additional land to be valued.
Based on the building approvals and lack of evidence of any impediment to construction, the court finds that the site contains additional land which is not needed to support the existing improvements and which has a separate value. As the income approach reflects the value of the existing shopping center and the land necessary to support it, it is appropriate to value the land necessary to support the approved but unbuilt improvements.
The court calculates five acres as the additional land necessary to support the approved but unbuilt improvements of 36,180 square feet, based on the total approvals for 263,620 square feet.[4] Municipality’s expert estimated $31,200 per acre on a discounted basis. The court will accept the land value of the subject site advanced by taxpayer’s expert of $50,000 per acre which he calculated under the cost approach. This raw land price, which was derived from the market, presumes adjustments because of the characteristics and status of the land. As such, there is no basis for a further adjustment. The indicated value of the additional land is $250,000.
The foregoing analysis can be summarized as follows for the 1995 and 1996 tax years:
INCOME
Supermarket 59.200 sf @ $7.50/sf $ 444,000
Department Store 88.200 sf @ $4.50/sf 396,900
Bank 2,664 sf @ $25/sf 66,600
Satellite Stores 77,136 sf @ $12/sf 227,200 sf 925,632
Gross Potential Income 1,833,132
*255 Less Vacancy/Collection Loss Allowance 12% $ 219,976
Effective Gross Income (EGI) 1,613,156
EXPENSES
Unreimbursed real estate taxes $ 39,936
Management, Prof. And
Commissions 10% of EGI 161,316
Structural repairs & reserves $.25/sf 56,800
Unreimbursed common area OE 24,560
Total expenses - $282,612
NET INCOME (NOI) TO BE CAPITALIZED 1,330,544
CAPITALIZATION RATE 10.25%
INDICATED VALUE VIA INCOME APPROACH $12,980,917
ADDITIONAL LAND VALUE 250,000
TOTAL VALUE $13,230,917
ROUNDED $13,230,900
For both tax years, the assessment on the subject property was $16,000,000. Pursuant to N.J.S.A. 54:51A-6(b), this court is required to apply the average ratio for each tax year of 1995 (97.40%) and 1996 (100%) to the indicated true value. As such, the court will direct the entry of judgments reducing the assessments for the 1995 and 1996 tax years as follows:
1995: Land $ 1,778,000
Improvements 11,108,900
Total $12,886,900
Land $ 1,825,500 1996:
Improvements 11,405,400
Total $13,230,900

 For example, municipality's appraiser made a - 25% location adjustment to the retail satellite lease designated as number seven, since it was located "just off the traffic circle in an area of heavy vehicular travel and is considered to be better located than the subject.”

 It is irrelevant that municipality's appraiser did not prepare the first appraisal but only signed as the "reviewer” while he actually prepared the second appraisal, since, by his own acknowledgment, “if you sign it, you bought it.”

 Although the August 10, 1995 rent roll reflects the bank's rental of 2,160 square feet in C9 store at $25.68 per square foot, there is no mention of square footage or rental in CIO store which was also occupied by the bank. Based upon testimony about the actual five year lease dated June 27,1990 which reflected 2,160 square feet for the bank and 504 square feet for the drive-in, it is apparent that the rent roll was not entirely accurate, nor was the 3,200 square foot calculation contained in the income approach, cash flow analysis of the second report of municipality's appraiser. Based upon a total of 2,228 square feet, the contract rental would be $20.82 per square foot.

 This figure is calculated by dividing the total approvals of 263,620 square feet by the total acreage of the site (36.51). The resulting number of 7,220 is the square footage of existing improvements per acre at the center, which is divided into the 36,180 square feet of approved but unbuilt improvements to arrive at the additional acreage necessary to support these improvements.