BIANCO, J.T.C.
This is the court’s determination with regard to a direct local property tax appeal concerning property located at 909 Bloomfield Avenue in the Township of West Caldwell, County of Essex, and designated as Lot 2 in Block 1504 by the taxing district (the “subject property”). The subject property is currently owned by PNC Bank, successor to Midlantic Bank.
For the 2001 tax year, the subject property was assessed as follows:
Land: $ 600,000
Improvements: $ 435,400
TOTAL: $1,035,400
The average ratio as promulgated by the Director of the Division of Taxation pursuant to N.J.S.A. 54:l-35(a) to -35(c) (L. 1973, c. 123) for 2001 in the Township of West Caldwell (the “Township”) is 88.10%, with the upper limit of the common level range being 100%, and the lower limit being 74.88%.
The land at the subject property is rectangular in shape and relatively level with the grade of Bloomfield Avenue. It measures 150 feet along Bloomfield Avenue, by 200 feet. Virtually all of the land is covered by structures or macadam parking areas and access ways, including side and rear parking for approximately 25 cars, and a canopy covered, four lane drive-up tellers. The total land area is approximately 30,000 square feet or 0.6887 acres.
The subject property is located in the Township’s B-2 shopping center zone. Permitted uses include primary commercial/retail, with storefronts for sale of commodities or services. Also included are restaurants, personal communication, and similar retail operations. Specifically prohibited are offices or professional buildings, bowling establishments, funeral homes, motor vehicle service sta *450 tioiis, public garages, car washes, and industrial, or manufacturing uses.
The zone requires a lot size of 15 acres, a depth of 500 feet, front yard of 150 feet, rear yard of 100 feet, two side yards of 50 feet each, maximum building height of 28 feet,' and lot maximum coverage of 30%. Based upon the current zoning, the use of the subject property is non-conforming.
The subject property is improved with a two-story, masonry and frame, branch bank facility, designed and constructed as such in 1972. The first floor consists of 2,972 square feet with an entry vestibule, open banking area containing several teller stations[1], a walk-in bank vault with safe deposit boxes, and adjoining safe deposit box viewing area. The second floor consists of 2,940 square feet with a prívate office and an open office area, a conference room, two restrooms, an employee lounge/lunchroom, and an approximately 450 square foot mechanical/utility room containing the building’s HVAC systems. The total gross building area is 5,912 square feet.
The subject property is not located in a flood hazard area, and is not encumbered by easements or rights-of-way, except for public utilities. It is served by electric, telephone, water, sewer, and natural gas.
Each party engaged the services of a professional real estate appraiser to provide an opinion of value of the subject property. The parties agreed that each one’s appraiser was qualified to testify as an expert. Both experts prepared appraisal reports that were admitted into evidence without objection. They valued the subject property, which is currently owner occupied, as if it is leased, utilizing comparable net leases pursuant to the income capitalization approach to value. Neither expert utilized the cost approach. Only the plaintiffs expert also utilized the sales comparison approach.
*451 The court concludes here, as it did in United Jersey Bank v. Lincoln Park Bor., 11 N.J.Tax 549 (Tax 1991) that, “[the subject] property should be valued exclusively by a capitalization of the income producible from its current use [as a branch bank].” Id. at 554. The sales comparison approach, utilized only by the plaintiffs expert, did not yield a reliable indication of value.[2] Furthermore, both experts agreed that the income capitalization approach is the primary valuation indicator for the subject property.
Under this approach to value, both experts concluded that the highest and best use of the property is its current use as a branch bank. Furthermore, the parties agreed that, (1) the appropriate vacancy and collection loss allowance is 5%,[3] and (2) the appropriate expense allowance is 10.3%.[4]
I. Potential Gross Income
Plaintiffs expert concluded that the Potential Gross Income (PGI)[5] for the subject property is $103,873. His conclusion was supported by seventeen net branch bank leases that he represented are comparable to the subject property. He further concluded, however, that six of the leases, specifically Nos. 8, 12, 13, 14, 16, and 17, are most comparable. Similar to the subject property, all six lease locations are in Essex County suburban communities. *452 Taking these six leases and making adjustments thereto,[6] plaintiffs expert arrived at a net rental value of $19.00 per square foot. The expert then applied $19.00 per square foot to a net rentable area[7] of 5,467 square feet, excluding the second floor mechanical/utility rooms containing approximately 450 square feet.
Defendant’s expert, in contrast, valued the subject property based upon the gross building area of 5,912 square feet that includes the second floor mechanical/utility rooms. Defendant’s expert analyzed each floor of the subject property separately: (1) the first floor was valued as a banking operation by comparing four net branch bank leases that he represented are comparable to the subject property; whereas, (2) the second floor was valued as office space by comparing four purportedly comparable net office leases. All of defendant’s lease locations are also in Essex County suburban communities. After making adjustments to the bank leases,[8] the expert determined a net rental value of $34.00 per square foot. Applying $34.00 per square foot to the 2,972 gross square feet of the first floor of the subject property, defendant’s expert arrived at a first floor PGI of $101,000.
As to the office leases, defendant’s expert made adjustments for physical conditions. The expert also made a blanket downward adjustment of $5.00 per square foot to reflect a net rental, and *453 applied a 10% discount assuming single tenant occupancy, as the subject property is presently being occupied and utilized. The expert determined a net rental value of $10.50 per square foot for the office component. Applying $10.50 per square foot to the 2,940 gross square feet of the second floor of the subject property, defendant’s expert arrived at a second floor PGI of $31,000. Defendant’s combined PGI is $132,000.[9]
The court finds that the gross building area of 5,912 square feet, under the facts of this case, is also the net rentable area. “[The] GROSS BUILDING AREA is not to be used for leasing purposes except where an entire building is leased to a single tenant.” Standard Method for Measuring Floor Area in Office Buildings, Measuring Gross Building Area (ANSI/BOMA Z65.11996) (emphasis added). The subject property was valued as a single tenant building by both experts. Accordingly, the court rejects plaintiffs contention that the second floor mechanical/utility rooms should be excluded from the net rentable area.
With regard to determining the PGI of the subject property (based on 5,912 square feet), the court finds that both experts have identified several comparable net branch bank leases that are indicative of the income potential for the subject property. The court, however, rejects plaintiffs leases Nos. 16 and 17 as too inconsistent in range with the others.[10] The Court further rejects defendant’s branch bank lease No. 2 since defendant’s expert testified that there were significant problems with that lease resulting in an overall 20% adjustment.[11]
*454 With the stated leases rejected, the court finds that plaintiffs leases Nos. 8, 12, 13, and 14 are comparable to the subject property, and produce a rental value range of $19.12 to $22.52 per square foot. The court also finds that defendant’s branch bank leases Nos. 1, 3, and 4, together with its net office leases are comparable to the subject property. Defendant’s comparable leases combined (i.e. office and branch bank), produce a net rental value range of $19.94 to $21.89 per square foot,[12] precisely within the parameters of plaintiffs net rental value range. Within this range the court concludes that $20 per square foot is the appropriate net rental value of the of the subject property.
The court’s conclusion in this regard is based primarily upon two factors. First, defendant’s expert valued each floor of the subject property separately (i.e. the first floor banking operation and the second floor office space), to arrive at an overall value. While the court agrees that, “the appropriate methodology for valuing [multi-use] property is on a component-by-component basis,” Hull Junction Holding Corp. v. Princeton Bor., 16 N.J.Tax 68, 77 (Tax 1996), the subject property cannot accurately be considered as a true multi-use property. The second floor office is only accessible from the first floor. Unless separate entrances are designed for each floor, and restrooms, an employee lunchroom and general area are redeveloped on the first floor, all of which would require municipal approvals, the subject property could not be effectively subdivided into a second floor office and first floor bank. In this regard, the court finds the analysis of plaintiffs expert more persuasive.
*455 Second, plaintiffs expert testified that new bank leases are based on rental space ranging from 2,500 to 3,500 square feet inclusive of all required amenities. All four of plaintiffs net branch bank leases accepted as comparable by the court fall within this range. Moreover, two of defendant’s three net branch bank leases accepted as comparable by the court also fall within this size range. The one that did not was just slightly larger.[13] These facts support plaintiffs contention that the oversized, older style branch bank of the subject property (designed and built as a branch bank in 1972), is not consistent with today’s branch bank market.
The court therefore concludes that, by multiplying 5,912 square feet by $20 per square foot net rental value, the PGI for the subject property is $118,240.
II. The Capitalization Rate
Plaintiffs expert determined the capitalization rate to be 10.028% (before the addition of a Tax Load Factor discussed infra). Defendant’s expert, in contrast, concluded that 9.5% is the appropriate capitalization rate. Both experts arrived at their respective opinions through the mortgage equity band of investment [14] technique, utilizing the following formula: Capitalization Rate = (Mortgage Constant x Mortgage Ratio) + (Equity Dividend Rate x Equity Ratio).[15]
Both experts made identical assumptions for the mortgage terms: an 8% interest rate for a 20-year loan period, but somehow differed in the application of the mortgage constant.[16] Plaintiffs *456 expert utilized a 'mortgage constant of .1004 while defendant’s expert utilized .0966. The experts also differed in then* respective applications of the equity dividend rate.[17] Plaintiffs expert applied an equity dividend rate of 10% whereas defendant’s expert applied 9%. There were also differing opinions with regard to the loan-to-value (i.e. mortgage-to-equity) ratio. Plaintiffs expert used a 75% — 25% loan to value ratio, whereas defendant’s expert used 70% — 30%.
The court is satisfied, and the experts agree, that the mortgage equity band of investment technique is the appropriate methodology in determining capitalization rates. American Cyanamid Co. v. Wayne Tp., 17 N.J.Tax 542 (Tax 1998), aff'd 19 N.J.Tax 46 (App.Div.2000). “This [mortgage equity band of investment ] technique is more reliable than mere selection of a rate based solely on capitalization rates in published data.” Id. at 577. See also Hull Junction, supra, 16 N.J.Tax at 84-85 holding that, “[t]he Band of Investment technique, ... has consistently been accepted by the Tax Court as an appropriate and reliable basis for determining market capitalization rates.” Ibid. (citations omitted).
The court is also satisfied that, under the mortgage terms assumed by both experts (i.e. 8% interest rate for a 20-year loan period), the appropriate mortgage constant is .1004. See Appraisal Institute, The Appraisal of Real Estate, 717, 725-26 (12th ed. 2001). See also published data by the American Council of Life Insurance, Tables 8 and 10. The .0966 mortgage constant utilized by defendant’s expert was clearly an error.
*457 As noted above, the parties’ experts assumed different loan to value ratios: 75%-25% for plaintiff, and 70% — 30% for defendant. The experts, however, offered no explanation or data to support them respective conclusions with regard to the loan-to-value ratio. This court is more persuaded by the conclusion of plaintiffs expert on this issue. It is reasonable to conclude that plaintiffs 75% — 25% loan to value ratio more accurately reflects the relatively low risk investment a branch bank poses to a lender. This is particularly true of the subject property, built and operated as a branch bank for about thirty years. The court therefore accepts plaintiffs 75%' — 25% loan to value ratio.
Plaintiffs expert testified that he derived an equity dividend rate of 10% from information published in Karpacz Real Estate Investor Survey. However, the Korpacz data upon which plaintiffs expert relied was neither included nor even mentioned in his report; and the data was not offered as evidence at trial. The Supreme Court and the Tax Court have held that, “an expert’s bare conclusions, unsupported by factual evidence, is inadmissible.” Buckelew v. Grossbard, 87 N.J. 512, 524, 435 A.2d 1150 (1981); Glen Wall Assocs. v. Wall Tp., 6 N.J.Tax 24, 32 (Tax 1983), aff'd, 6 N.J.Tax 448 (App.Div.1984), rev’d, 99 N.J. 265, 491 A.2d 1247 (1985) (emphasis added). “Evid.R. 56(2)(a) ... provides that the [expert] testimony must be based ‘primarily on facts, data or other expert opinion established by evidence at the trial.’” Buckelew, supra, 87 N.J. at 524-25, 435 A.2d 1150 (emphasis added).
[EJvidence, data, and the totality of the facts on the basis of which the opinion is arrived at must be made known to the court so that it may evaluate the validity of the opinion and conclude what weight, if any, is to be given to that opinion.
[Bowen v. Bowen, 96 N.J. 36, 49-50, 473 A.2d 73 (1984), citing Glen Wall Assocs., supra, 6 N.J. Tax at 31-33; Towers Assocs. v. City of East Orange, 16 N.J. Tax 483, 485 (App.Div.1997)].
Accordingly, the court is inclined to give little weight to plaintiffs equity dividend rate of 10%.
In selecting an equity dividend rate of 9%, defendant’s expert substantially relied upon Regional Investment Criteria for the Fourth Quarter 2000, published by Real Estate Research Corpo *458 ration (RERC). Defendant's expert included the RERC data as an exhibit to his report. Using the RERC data, defendant’s expert characterized the subject property as Suburban Office Building. The RERC data indicates that defendant’s 9.5% capitalization rate would place the subject property at the average range of a second tier suburban office building.[18] “Second tier investment properties are defined as aging, formerly first tier properties, in good to average locations.” Real Estate Research Corporation, Regional Investment Criteria Fourth Quarter 2000. “Second Tier Investment Properties” in 69 n. 1 (2000).
The court is satisfied that the subject property meets the definition of a second tier property. However, its characterization as Suburban Office Building is rejected. The subject property is a branch bank, and the second floor office space is ancillary to the primary banking operation. Banks are essentially retail establishments. Assem. Banking and Ins. Comm., Comm. Statement to Assembly Bill No. 3260, (Nov. 28, 1977; L. 1977, c. 370), cited in Roman Catholic Archdiocese of Newark v. City of East Orange, 17 N.J.Tax 298, 317 (Tax 1998). Defendant’s expert conceded during cross-examination that the first floor of the subject property is utilized as a retail banking operation, but maintained that the second floor is utilized as office space.[19]
The RERC data relied upon by defendant’s expert also indicates that the average going-in cap rate for second tier properties in the Neighbor/Community Retail category is 9.9%.[20] The court finds *459 that the second tier Neighbor/Community Retail category more adequately reflects the subject property’s primary retail banking operation.
In applying the capitalization rate formula, defendant used a 9% equity dividend rate, an incorrect mortgage constant of .0966, and a loan to value ratio of 70% — 30%, to arrive at a capitalization rate of 9.5%.[21] However, using the same 9% equity dividend rate, in the capitalization rate formula, along with the correct mortgage constant of .1004, and the 75% — 25% loan to value ratio accepted by the court, the resulting capitalization rate is 9.8% (or .098).[22] This capitalization rate, like defendant’s 9.5% rate, falls within the RERC ranges for second tier properties in both the neighborhood/community retail and suburban office categories.[23] However, the court is satisfied that a 9.8% capitalization rate (even utilizing defendant’s 9% equity dividend rate), more appropriately reflects the primary retail banking use of the subject property, while also taking into consideration the ancillary office use.
Accordingly, the court will accept defendant’s equity dividend rate of 9%. The court therefore finds that the appropriate capitalization rate is 9.8%.
III. Adding a Tax Factor to the Capitalization Rate
Plaintiff argues that the capitalization rate must include the addition of a tax factor. This, plaintiff explains, is because, if the subject property is leased (as opposed to its current status as owner occupied) and becomes vacant, the landlord would have to pay the taxes.
It is well established that a tax factor is properly added to the basic capitalization rate when the property is valued *460 on the basis of gross rents (i.e. where taxes are paid by the landlord). City of New Brunswick v. Division of Tax Appeals, 89 N.J. 537, 545-7, 189 A.2d 702 (1963); RTC Props. v. Town of Kearny, 13 N.J.Tax 146, 156-57 (Tax 1993); Hull Junction, supra, 16 N.J.Tax at 102-03. However, “[wjhere the property in question is subject to a net lease, the tenant paying the taxes (as well as other expenses), a tax factor is not included in the capitalization rate.” RTC Props., supra., 13 N.J.Tax at 157 (citations omitted) (emphasis added). The court reasoned:
Given the way taxes must be handled in property tax cases, ie., as a component of the capitalization rate and not as a line item expense, no taxes are attributable to vacant space as that space, by viitue of the vacancy and loss allowance, is not being valued. Thus, the court finds it inappropriate to include a tax factor in the capitalization rate to the extent of the vacant space.
[Id. at 157 (emphasis added).]
Plaintiffs expert testified that he valued the property pursuant to the income approach based on comparable net leases. Plaintiff argues that even in a net rent context, the landlord’s potential additional tax obligation during times of vacancy must be accounted for. In support of its position, plaintiff cites a footnote contained in Hull Junction. The footnote provides in pertinent part:
If proofs were presented that, in a net rent context, the landlord is responsible for real estate taxes attributable to vacant space or space occupied by tenants in financial default, the addition to the basic capitalization rate of a tax factor, equal to the effective tax rate multiplied by the vacancy and collection loss allowance, would appear to be appropriate.
[Hull Junction, supra., 16 N.J. Tax at 108 n. 5 (citations omitted) (emphasis added).]
Plaintiffs expert selected 10.028% as his basic capitalization rate. He then accounted for a landlord’s potential added tax obligation by adding a tax factor of 0.13%[24] to the basic capitalization rate, for an overall capitalization rate of 10.2% (rounded-up).
*461 Plaintiffs analysis that includes a tax factor is flawed, and its reliance on a hypothetical situation contained in a footnote in Hull Junction to support that analysis, is misapplied.
The court notes that the subject property in Hull Junction was a multi-tenant, “multi-use, multi-building facility ... [comprised of] ... office, retail and apartment components, an indoor parking garage and rights to build ninety-seven additional residential units.” Hull Junction, supra, 16 N.J.Tax at 73-74. The multifaceted property in Hull Junction is in sharp contrast to the single tenant, owner-occupied branch bank of the present case. While the court has relied upon various aspects of the Hull Junction holding in this opinion, clearly the subject properties of the two cases are too dissimilar for there to be complete and total correlation between the valuation methodology employed or hypothesized in each case.
Moreover, this court knows of no case since Hull Junction, and the plaintiff points to no case, where a tax factor has been added to the basic capitalization rate in a net rent context to account for a landlord’s payment of taxes during times of vacancy. See Pine Plaza Assocs., L.L.C. v. Hanover Tp., 16 N.J.Tax 194 (Tax 1996); Harrison Realty Corp. v. Town of Harrison, 16 N.J.Tax 375 (Tax 1997); Laneco Three, Inc. v. Franklin Tp., 17 N.J.Tax 233 (Tax 1998); American Cyanamid, supra, 17 N.J.Tax 542; MSGW Real Estate Fund v. Mountain Lakes Bor., 18 N.J.Tax 364 (Tax 1998); Entenmann’s Inc. v. Totowa Bor., 18 N.J.Tax 540 (Tax 2000).
Subsequent to Hull Junction, the court in Pine Plaza explained the proofs necessary under Hull Junction before even considering the addition of a tax factor in a net rent context:
The quoted language from the Hull Junction opinion [upon which plaintiff in the present case relies] requires proofs that the market (the source of the economic data used in the income approach analysis) demonstrates that the landlord, in a net rent context, is not reimbursed for real estate taxes attributable to vacant space and space in financial default.
[Pine Plaza, supra., 16 N.J.Tax at 215.]
Notwithstanding appropriate proofs, the court in Pine Plaza only went as far as to say that, “[t]he addition to a capitalization rate of a tax factor as determined by plaintiffs expert may be *462 appropriate.” Ibid. (emphasis added). This court notes that no proofs supporting the addition of a tax factor were presented in Hull Junction, supra, 16 N.J.Tax at 108 n. 5, and the addition of a tax factor was rejected in Pine Plaza, supra, 16 N.J.Tax at 216.
Under the present facts, in considering the appropriateness of adding a tax factor to the basic capitalization rate in a net rent context, this court is more persuaded by reason and legal precedent, than by a theory advanced under significantly dissimilar considerations and circumstances.
It is true, as plaintiff suggests, that in a single tenant (net lease) branch bank, valued under the income approach, the landlord will be responsible for taxes during times of vacancy. However, the Tax Court has recognized that “the appraisal of real property is not an exact science,” Highview Estates v. Englewood Cliffs Bor., 6 N.J.Tax 194, 217 (Tax 1983) (citing Appraisal Institute, The Appraisal of Real Estate 395-96, (8th ed. 1983), and that “[mjathematical perfection in taxation is unattainable.” Ibid., citing In re Appeal of Kents, 2124 Atlantic Ave., Inc., 34 N.J. 21, 32, 166 A.2d 763 (1961)).
“Income-producing real estate is typically purchased as an investment, and from an investor’s point of view earning power is the critical element affecting value.’’ The Appraisal of Real Estate, supra, (12th ed. 2001) at 471 (emphasis added).
The rents collected each year are typically less than annual potential gross income, so an allowance for vacancy and collection loss is usually included in the appraisal of income-producing property.
[/A at 512 (emphasis added).]
A market vacancy and collection loss allowance is typically included even when, as with the present case, there is no history of actual vacancy and collection loss. Ibid
The Tax Court has held that
[T]he vacancy [and collection loss] allowance projected by the appraiser is nothing more than a subjective judgment of the long-term quality and durability of the income stream. RTC Properties, supra, 13 N.J.Tax at 154, citing Newark v. 1013 Corp., 1 N.J.Tax 107 (Tax 1980); Univ. Plaza Realty v. Hackensack 12 N.J.Tax 354, 369 (Tax 1992). This judgment... must be supported in some measure by evidence of prevailing market conditions.

*463
Ubid.]

In the present case, the parties agreed to a vacancy and collection loss allowance of 5%.
Vacancy and collection loss is defined as “[a]n allowance for reductions in potential gross income attributable to vacancies, tenant turnover, and nonpayment of rent.” The Appraisal of Real Estate, supra, 512 (12th ed. 2001). It stands to reason that, if income is reduced by an allowance for vacancy and collection loss, then, under the income approach to value, taxes based on the adjusted income will also be reduced. This explains what the court meant in RTC Props, when it held that, “no taxes are attributable to vacant space [in a net rent context] as that space, by virtue of the vacancy and loss allowance, is not being valued.” RTC Props., supra, 13 N.J. Tax at 157.
The court finds no basis here to deviate from the holding in RTC Props. Accordingly, plaintiffs argument that a tax factor must be added to the basic capitalization rate is rejected.
IV. Determination of Value
The calculation of the true value of the subject property is as follows:
5,912 sq. ft. x $20 per square foot = $ 118,240 (PGI)
Less 5% of PGI (agreed) as a vacancy and collection loss allowance - 5,912
Effective Gross Income (EGI)[25] = $ 112,328
Less 10.3% of EGI (agreed) as an expense allowance - 11,570
Net Operating Income (NOI)[26] = $ 100,758
Capitalized @ 9.8% .098
*464 TRUE VALUE = $1,028,143
Since the 2001 assessed value of $1,035,400 exceeds the determined true value of $1,028,143, plaintiff has proved entitlement to an assessment equal to the true value multiplied by the average ratio of 88.1%, or $905,793.98, which is rounded to a final assessment of $905,800. N.J.S.A. 54:51-6(b), Passaic Street Realty Assoc., Inc. v. Garfield City, 13 N.J.Tax 482, 486 (Tax 1994). Of this final assessment, $600,000 is allocated to land and the balance of $305,800 to improvements.
Accordingly, the Clerk of the Tax Court is directed to enter judgment as follows:
Land: $600,000
Improvement: $305,800
TOTAL: $905,800

 Defendant claims there are five teller stations, whereas plaintiff claims there are seven.

 Plaintiff’s expert testified that it is difficult to do a meaningful sales comparison of a branch bank. He was able to find only four branch bank sales purchased by banks. Of these sales, three are located in southern New Jersey. Only one is located in Essex County like the subject property. No block and lot numbers, names of sellers, deed recording information, or SR1A numbers were provided for these sales. See R. 8:6 — 1 (b)(2). Furthermore, the terms and conditions of each sale were not provided.

 The vacancy and collection loss allowance is a percentage of the potential gross income (PGI, discussed more thoroughly in Section I of this opinion), which, when deducted therefrom produces the effective gross income (EGI).

 The expense allowance is a percentage of the EGI (see note 3), which, when deducted from EGI produces net operating income (NOI).

 PGI = market rent X net rentable area (see note 7).

 Plaintiff's expert made a -0.3 adjustment for Improvement Age, Quality to Nos. 13 and 14 only, arriving at net adjusted per square foot values for all six leases as follows: No. 8 at $20 per square foot, No. 12 at $19.14 per square foot, No, 13 at $22.52 per square foot, No. 14 at $19.12 per square foot, No. 16 at $16.08 per square foot, and No. 17 at $12.36 per square foot.

 Net Rentable Area: Floor area of a building less any vertical penetrations of the floor. No deductions are made for necessary columns and projections of the building (BOMA Standards). Black's Guide, Glossary of Real Estate Terms, 41 (2001).

 Defendant's expert considered four branch bank leases with adjusted net per square foot values as follows: No. 1 at $33.12 per square foot, No. 2 at $42.53 per square foot, No. 3 at $29.23 per square foot, and No. 4 at $32.26 per square foot. Adjustments were made for time/market to Nos. 2 and 3 (-5% and -10% respectively), for location to Nos. i, 2, and 4(+5%), and for physical condition to Nos. 1, 2, and 3 (-15%, +15%, and + 15% respectively).

 The court notes that dividing defendant’s combined (first and second floor) PGI of $132,000 by the 5,912 square feet gross building area produces an average per square foot value of $22.33 for the whole building.

 Without plaintiffs leases Nos. 16 and 17, the disparity in range of the plaintiffs remaining four leases is only $3.40 per square foot. With 16 and 17 included, the disparity is over $10.

 Defendant's expert arrived at an adjusted rental value of $42.53 per square foot for branch bank lease No. 2, more than $9 above the next closest of branch bank lease.

 The court arrived at this range based on defendant's comparable leases as follows: (adjusted per square foot value for each comparable bank lease) x (2,972 square foot first floor gross building area) = (first floor PGI) + ($31,000 second floor PGI) = (first and second floor PGI) (5,912 total gross building area) = (total adjusted per square foot value). Comparable bank lease No. 1: $33.12 x 2,972 = $98,432.64 + $31,000 = $129,432.64 -r 5,912 = $21.89 per square foot. Comparable bank lease No. 3: $29.23 x 2,972 = $86,871.56 + $31,000 — $117,871.56 -s- 5,912 = $19.94 per square,foot. Comparable bank lease No. 4: $32.26 x 2,972 = $95,876.72 + $31,000 = $126,876.72 - 5,912 = $21.46 per square foot. Range: $19.94 to $21.89.

 Only three of plaintiffs seventeen branch bank leases, and just one of defendant’s four branch bank leases, none of which were accepted as comparable by the court, were significantly greater in area than 3,500 square feet.

 Band of Investment — "A technique in which the capitalization rates attributable to components of a capital investment are weighted and combined to derive a weighted-average rate attributable to the total investment.” Appraisal Institute, The Appraisal of Real Estate 535 (12th ed. 2001).

 Id. at 536.

 Mortgage Constant — "The total annual payments of principal and interest (annual debt service) on a mortgage with level-payment amortization schedule, *456 expressed as a percentage of the initial principal amount of the loan." Appraisal Institute, Real Estate Appraisal Terminology 144 (Boyce ed., 1975).

 Equity Dividend Rate — "An income rate that reflects the relationship between a single year’s equity dividend and the initial equity investment; used to convert equity dividend into an equity value indication; also called the cash on cash rate, cash flow rate, or [equity capitalization rate]." Appraisal of Real Estate, supra, at 536.

 RERC East Investment Criteria Fourth Quarter 2000 — Second Tier Office/Suburban indicates a going-in cap rate (%) range of 7.5 — 10.5, with an average range of 9.5%.

 There is some question as to whether or not the office space is actually being used at all. Plaintiff's expert testified that he believed the office space was being used from its appearance, but admitted that he never actually witnessed the space in use. There was similar testimony from defendant’s expert.

 RERC East Investment Criteria Fourth Quarter 2000 — Second Tier Retail-Neighbor/Community indicates a going-in cap rate (%) range of 8.0 — 11.0, with an average range of 9.9%.

 Defendant's Capitalization Rate = (.0966 x .70) + (.09 x .30) — .09462 (rounded to 9.5%).

 The court's determined Capitalization Rate = (.1004 x .75) + (.09 x .25) = .0978 (rounded 9.8%).

 See notes 18 and 20.

 3,02% tax rate multiplied by the 88.10% ratio = the effective tax rate of .02660 multiplied by the 5% vacancy and collection loss allowance = 0.13% tax factor. This tax factor calculation is not altered by the court's earlier determination that 9.8% is the appropriate capitalization rate.

 See note 4.

 See note 5.