KORVETTES HOME FURNISHING CENTER, PLAINTIFF, v. BOROUGH OF ELMWOOD PARK, DEFENDANT.

Tax Court of New Jersey

May 9, 1980.

*David M. Mandelbaum, Mandelbaum and Mandelbaum* for plaintiff.

*Stephen R. Spector, Glock & Spector* for defendant.

ANDREW, J. T. C.

Plaintiff seeks a reduction in its local property tax assessment based on its allegations that the assessment for the tax years of 1973 and 1974 is in excess of true value and also on the basis that its property is assessed at a ratio of assessment to true value substantially higher than the common level of assessments in the taxing district. This matter was originally heard by Judge Mott of the Division of Tax Appeals on April 28, 1977. Since Judge Mott did not decide this matter, it was transferred to the Tax Court for determination pursuant to *N.J.S.A.* 2A:3A-26.

This Court conducted a conference of counsel on March 7, 1980, at which time the parties agreed that this matter should be determined on the record developed in the Division of Tax Appeals along with the stipulations which were made at the conference.

The parties agreed and stipulated to the following:

(1) The land size is 11.74 acres and land value is $95,000 per acre giving rise to an overall land value of $1,115,300.

(2) The improvement contains 225,960 square feet.

(3) The two tax years under consideration are 1973 and 1974.

(4) The Freeze Act, *N.J.S.A.* 54:2–43 will apply to the assessment determination made by the Court.

(5) The common level of assessment in the taxing district was 61.27% (the Director of Taxation's ratio for 1973 was 65.20% and for 1974 was 57.34%. It was agreed that the common level or ratio of assessed to true value in the taxing district for the two tax years was the average of the Director's two ratios or 61.27% and that this ratio would be applied to a true value determination to be made by this Court).

(6) The income approach to value was the most appropriate method by which to value the subject property and would be the only method to be used by the Court in a determination of fair assessable value.

(7) The vacancy and/or collection loss allowance in the income approach would be 5% of net income.

(8) There will be no deductions allowed for expenses since the Court would determine a fair market *net* rental to be applied to the subject.

(9) The capitalization rate would be 11.5% representing a 9% return on investment and 2.5% recapture or allowance for future depreciation.

(10) The Court would capitalize *net* income before taxes in accordance with *Humble Oil & Refining Co. v. Englewood Cliffs*, 71 *N.J.* 401, 365 *A*.2d 929 (1976).

The subject property is Lot 1, Block 119B of the tax map of the Borough of Elmwood Park commonly known as 397 East 54th Street. The assessments for the tax years of 1973 and 1974 were:

| | |
|---|---|
| Land | $ 357,750 |
| Improvements | 2,042,250 |
| Total | $2,400,000 |

The Bergen County Board of Taxation dismissed appeals for both tax years thereby affirming the assessments.

The property consists of an 11.74 acre tract of land improved with a one-story concrete and steel framed warehouse facility containing 225,960 square feet of space of which 30,800 square feet was used for office purposes. The property was vacant at the time of the hearing.

Since the parties have agreed that the common level of assessment in Elmwood Park for the tax years in question was 61.27%, the only issue remaining for determination by this Court is the fair market value of the subject property (Specifically, the improvements, since land value was also stipulated). This issue has been narrowed by the parties to a determination of net fair rental value since all of the other requisites for the use of an income analysis have been supplied by stipulation. The search therefore is for net economic or net fair market rent for the subject property.

The taxpayer's expert estimated that the net rent potential of the subject was $1.30 a square foot. He considered the actual contract rent but ignored the same because contract rent did not represent economic rent. In arriving at his determination of $1.30 per square foot he relied upon one rental of comparable property known as 600 Washington Avenue, Carlstadt, New Jersey located several miles from the subject.

The comparable property had 29.62 acres of land improved with a 567,390 square foot building similar to the subject. The lease under consideration was for a period of 20 years beginning February 1, 1975. The premises were 264,923 square feet and the annual net rental was $1.30 per square foot. On cross–examination, the expert indicated that Carlstadt was a highly industrial area while Elmwood Park was basically residential but he used the Carlstadt property because he could not find any

comparable rentals in Elmwood Park that would involve proper-
ties similar in size to the subject.

■ The taxing district's expert also considered but disregard-
ed the actual contract rent for the subject as not being indica-
tive of economic rent. The municipality's expert believed that
net economic rental for the subject would be $1.75 per square
foot for 1972 (he assumed that the 1972 assessment was also
being contested), $1.85 per square foot for 1973 and $1.95 per
square foot for 1974. He relied primarily upon a lease of 41
Slater Drive in Elmwood Park which property was located
approximately one mile from the subject. This was a 30 year
net lease commencing May 1, 1972 and ending August 31, 2002.
The land area was 6.40 acres and improvements consisted of
145,676 square feet of warehouse space with 9,111 square feet of
office facilities. The lease indicated a net rental of $2.08 per
square foot. The three other rentals to which he testified were
not rentals but were only buildings available for rent with an
indication as to the owners' asking rental price. I find that
offers to rent do not assist in the search for fair market rental
primarily because they represent only one half of the necessary
equation i. e., that rental which may be what an owner wants
but not necessarily the rental that a prospective tenant would be
willing to pay. Additionally I would reject them because they
were considerably smaller than the subject and do not lend
themselves to a rational comparison.

■ The income estimate is the initial step in the income
approach to value. Lease agreements of comparable space must
be reviewed in order to arrive at an estimate of economic rental
which the subject could be expected to produce in the rental
market for the years in question. *American Institute of Real
Estate Appraisers, The Appraisal of Real Estate*, Chap. 18 (7th
Ed. 1978). In arriving at an income estimate, consideration
must be given not only to the quantity of the income stream but
also to its quality and durability. *Id.* at 328, 329.

The vacancy of the subject and the offers to rent produced by
the taxing district's expert tend to indicate that there may have

been an oversupply of warehouse facilities in Elmwood Park during the applicable period. This would affect the period over which a property can be anticipated to produce a certain income (durability of income) and likewise the value of the subject.

I have reviewed the two rentals of comparable space and make the following observations. The rental submitted by the taxing district's expert was only 68½% the size of the subject. It is conceded that smaller spaces lease at higher rentals per square foot than larger properties. The comparable improvement was built in 1972 and therefore the lease commencing May 1, 1972 was for a new structure while the subject improvement was in existence for approximately 9 years as of the first assessment date of October 1, 1972. Adjustments must be made for size and age of the comparable space in order to arrive at a fair estimate of net rental for the subject.

In regard to the rental of comparable property offered by the taxpayer's expert, I find the following difficulties. The comparable was 17% larger than the subject which would indicate a larger square foot rental for the subject than the comparable.

The comparable lease commenced on February 1, 1975 which was 16 months after the last assessment date in question (October 1, 1973) therefore adjustment would be required for a time differential. The comparable is located in a taxing district other than Elmwood Park. There was no evidence adduced as to the tax structure in Carlstadt. The tax structure of the political subdivision in which the comparable space is located may be an important factor in the desirability of a warehouse site. The tax level applicable to one site must be compared to that of a competing site in order to determine acceptability to a typical investor.

 Considering all of the factors which have been mentioned and the adjustments necessary for time, location, size, quantity and durability of income, I find that the proofs indicate that a fair estimate of net rental for the subject property would be $1.75 per square foot. On balance, I find the rental estimate

submitted by the municipality to be more persuasive, however, I do not accept the sliding scale of rental values submitted. I find the value to be the same for both tax years. *Cf. New Brunswick v. State of N. J., Div. of Tax Appeals*, 39 *N.J.* 537, 550, 189 *A.*2d 702 (1963); *Feder v. Passaic*, 105 *N.J.Super.* 157, 162, 251 *A.*2d 457 (App.Div.1969).

Utilizing $1.75 per square foot as net economic rental value and the stipulations of the parties, my economic analysis is as follows:

| | |
|---|---|
| Net Rental Income (225,960 square feet at $1.75) | $ 395,430 |
| Less: Allowance for vacancy and collection losses at 5% as agreed | $ 19,771 |
| Effective Rental Income | $ 375,659 |
| Expenses—none as agreed | – – – – |
| Net Operating Income | $ 375,659 |
| Deduct income to land ($1,115,300 × 9%) | $ 100,377 |
| Net Income to Improvements | $ 275,282 |
| $275,282 capitalized at 11.5% (9% return, 2.5% recapture) rounded | $2,393,800 |
| Add value of land | $1,115,300 |
| Value for 1973 and 1974 | $3,509,100 |

Pursuant to the stipulation of the parties the common level of 61.27% will be applied to the true value determination. Applying this ratio of 61.27% to the true value I direct the entry of judgment by the Clerk of the Tax Court for the tax years 1973 and 1974 as follows:

1973 and 1974

| | |
|---|---|
| Land | $ 683,300 |
| Improvements | 1,466,700 |
| Total | $2,150,000 |

Since the application of the Freeze Act, *N.J.S.A.* 54:2–43 has also been stipulated, the Clerk will also issue judgments for 1975 and 1976 in accordance with the above.