CRABTREE, J.T.C.
This is a local property tax case wherein plaintiff seeks direct review of the 1989 and 1990 assessments on its property located at *149 100 Central Avenue, Kearny, New Jersey (Block 288, Lots 8, 9 and 10) [1] The assessments were:
1989 1990
Land $11,862,500 $11,862,500
Improvements 23,502,300 23,624,300
Total $35,364,800 $35,486,800
At issue are the true value of the subject property and whether plaintiff is entitled to statutory discrimination relief pursuant to N.J.S.A. 54:51A-6.
The subject of the controversy is an industrially-zoned, 148.183-acre tract of land improved with 14 buildings constructed between 1915 and 1974 and containing a total leasable floor area of
2.775.000 square feet. The property, which plaintiff acquired from AT & T Technologies, Inc. in 1985, had been a facility for the manufacture of telephones and related equipment by Western Electric, a quondam subsidiary of AT & T. After the sale to plaintiff the property was converted to a multi-tenanted industrial facility, with all but 941,895 square feet and 843,725 square feet occupied by tenants or by plaintiff on October 1,1988 and October 1, 1989, respectively. The use of the property on the assessing dates was in accordance with defendant’s zoning ordinance.
The contract rentals, all net, ranged from $1.34 a square foot for 346.000 square feet in buildings 71-72 to $4.80 a square foot for 4,515 square feet in building 83. Approximately 500,000 square feet in the largest building, Building 20-39, a 6-story structure known as the Telephone Apparatus (T/A) Building, was leased for unit rentals ranging from $1.75 a square foot to $2.50 a square foot. On both assessing dates approximately 591,000 square feet in the T/A Building were vacant.
*150 The area-weighted vacancy was 33.92% on October 1, 1988 and 30.38% on October 1, 1989. The dollar-weighted vacancy was 27.71% on October 1, 1988 and 22.75% on October 1, 1989.
The parties agreed that 48.183 acres of the total land area was excess land, the value of which they agreed was $155,000 an acre on October 1, 1988 and $162,750 an acre on October 1, 1989. The entire excess land acreage was paved with a macadam surface which was in a state of general disrepair on the assessing dates.
The parties also agreed on the net economic rent for the entire leasable area except for Building 40, a one-story and basement structure built in 1962. The building, which contains 168,666 square feet of floor area, had been used by AT & T as a plant administration building accommodating management personnel and plant service operations (such as nursing, emergency medical and dental care) and board meetings. It was abandoned in 1984, shut down in 1985 and has been vacant ever since except for 30,000 square feet in the basement leased to Hudson County for the storage of voting machines. The building is in a deplorable condition: it is in urgent need of a new roof, new wiring and electrical installation, ceiling tiles, floor covering and a new HVAC system adapted to multi-tenanted occupancy. Plaintiff’s management estimates the cost of renovation and readaptation at $20 to $25 a square foot, exclusive of the roof, which they estimate will cost $1.50 to $2 a square foot. Plaintiff’s expert estimated the same costs to be $30 a square foot, including the roof.
Building 40 was offered for lease at $3.75 a square foot but there were no takers.
Plaintiff’s expert estimated the true value of the subject property, revised .to reflect the stipulations of the parties, at $37,646,700 on October 1, 1988 and $38,020,100 on October 1, 1989. In arriving at these conclusions he relied solely upon the income approach to value, utilizing the same net operating income and capitalization rate for both years. He accepted the economic rent estimates of defendant’s expert for all leasable space except Building 40, with respect to which he estimated an economic rent of $2.50 a square foot. From the gross income thus derived he *151 deducted a 20% vacancy and credit loss allowance, 5% management fee, 5% leasing commission, $.50 a square foot of unreimbursed expenses and amortization of tenant improvements of $.20 a square foot multiplied by his estimate of an area-weighted occupancy rate of 75%.[2] These deductions resulted in net operating income of $3,470,502 which the expert capitalized at 11.5%. His capitalization rate, developed under the mortgage-equity band of investment technique,[3] included a component of .50 reflecting 25% of the effective tax rate on the premise that, although the leases were net with the tenants paying the taxes, the landlord would remain responsible for taxes attributable to the vacant space. As with the unreimbursed expenses, the portion of taxes payable by the landlord was calculated on an area-weighted basis, i.e., 25% of total leasable space would be vacant at any given time.
To the income capitalized as aforesaid the expert added the agreed-upon value of the excess land, namely, $7,468,400 for 1989 (48.183 acres x $155,000) and $7,841,800 for 1990 (48.183 acres x $162,750).
Defendant’s expert estimated the true value of the subject property to be $61,328,000 on October 1, 1988 and $61,702,000 on October 1,1989. In arriving at these conclusions of value he, like plaintiffs expert, relied exclusively upon the income approach except for the value of the excess land and the macadam paving thereon.
*152 The experts—and the parties—agreed upon the net economic rent for all leasable space except Building 40, the economic rent for which defendant’s expert estimated at $5 a square foot (except for 30,000 square feet leased to Hudson County for $3 a square foot, which the expert accepted as economic rent). From the gross income thus developed ($7,667,015) he deducted a 15% vacancy and loss allowance, producing effective gross income of $6,516,963. He then deducted 15% of effective gross income for commissions, management and reserves, arriving at net operating income of $5,539,419, which he then capitalized at 10.5% under the mortgage-equity band of investment method.[4] Finally, he added the stipulated land value of the excess land and the value of the paving which he estimated at $22,000.
The expert posited net leases for the entire property but he made no allowance either for the landlord’s unreimbursed expenses attributable to vacant space or for the taxes paid by the landlord attributable to vacant space.[5] The expert also declined to deduct amortized tenant improvements paid by the landlord as an expense.
The foregoing narrative raises the following valuation issues:
(1) economic rent for Budding 40;
(2) vacancy and loss allowance;
(3) deduction for unreimbursed expenses;
(4) amortization of tenant improvements paid by the landlord;
(5) inclusion of a tax factor in the capitalization rate to account for taxes paid on vacant space;
*153 (6) the appropriate capitalization rate, and
(7) whether the estimated value of paving should be added to the stipulated value of the excess land.
I.

Building Ifi.

Plaintiffs expert acknowledged on cross-examination that Building 40 could be rented for $5 a square foot net, the rent posited by defendant’s expert, if the building were renovated and adapted to multiple-tenant occupancy. The credible evidence, however, indicates that it is not economically feasible to renovate the building and adapt it to multiple-tenant occupancy in order to achieve a $5 rental. The proofs show that the renovation costs, including the cost of a new roof, amount to $30 a square foot or approximately $5,060,000 (168,666 square feet x $30 = $5,059,-980). At $5 a square foot, allowing for 15% vacancy (a conservative estimate, in view of the difficulty plaintiff experienced in leasing the building), 15% expenses and a capitalization rate of 11.3% (the approximate capitalization rate posited by plaintiffs expert) the capitalized value of the building would be approximately $5,400,000, after renovations amounting to $5,060,000.
The court therefore finds the economic rent for Building 40 to be $3 a square foot net, the contract rent for the 30,000 square feet in the basement leased to Hudson County for the storage of voting machines. The highest and best use for the entire building is a warehouse.
II.

Vacancy Allowance.

Plaintiffs expert relied upon a dollar-weighted approach to estimate the vacancy allowance for the subject property. Simply put, this means that rent loss from vacant space is calculated on the basis of the rent that space would command in the marketplace; it recognizes that different market rentals apply to different areas of a building or complex of buildings. The rationale is *154 that the most desirable—and hence the most expensive—space rents first, and that the least desirable—and least expensive— space rents last. The expert argued that the dollar-weighted method was more accurate than the area-weighted approach and produced a lower vacancy allowance.
Whatever may be the analytical merits of the two approaches to a vacancy estimate, the fact remains that the vacancy allowance projected by the appraiser is nothing more than a subjective judgment of the long-term quality and durability of the income stream. Newark v. 1013 Corp., 1 N.J.Tax 107 (Tax 1980); Univ. Plaza Realty v. Hackensack, 12 N.J.Tax 354, 369 (Tax 1992). This judgment, however, must be supported in some measure by evidence of prevailing market conditions. As appealing as plaintiffs expert’s analysis may be, his dollar-weighted approach requires substantially more supporting data in the form of the quantum and duration of vacancies and rent levels in the relevant market area than is usually available. Those data were certainly not forthcoming in this case.
The vacancy allowance posited by defendant’s expert, on the other hand, is straightforward and is supported by the recent occupancy history of large industrial buildings, in the immediate vicinity of the subject, converted from warehousing or manufacturing uses under single occupancy to multi-tenanted use. The expert was also cognizant of the occupancy history of the subject, which indicates that 75% of the property was rented up within five years after plaintiffs acquisition.
I find, therefore, that a 15% vacancy and loss allowance is appropriate for all the buildings except Building 40. I find a vacancy factor of 20% to be appropriate for that building, in view of the almost total lack of success in renting the structure and also in view of the fact that the renovations needed to make it tenantable are not economically feasible.
III.

Deduction for Unreimbursed Expenses.

Both experts posited net leases, ie., the tenants pay all expenses, except management, reserves and structural repairs. *155 Plaintiffs expert, however, recognizes that expenses must be paid whether space is tenanted or vacant. He therefore assumed, quite properly, that the landlord would be required to pay expenses attributable to vacant space and deducted what he felt to be an appropriate amount in arriving at income to be capitalized.[6]
To develop a stabilized square-foot cost for unreimbursed expenses, the expert analyzed the actual costs in the relevant expense categories for 1988 and 1989, arriving at $1.13 a square foot net cost for 1988 and $.77 a square foot for 1989. Recognizing that certain expenses tend to be higher in a start-up period, such as the time embraced by the valuation dates in this case, he stabilized the unreimbursed expenses at $.50 a square foot for each year.
The expert’s approach is eminently sound and supported by the evidence. Accordingly, I will accept the deduction for unreimbursed expenses postulated by plaintiffs expert.
IV.

Amortization of Tenant Improvements.

Plaintiffs expert deducted from effective gross income an amount representing the amortization of tenant improvements (sometimes called “fit-ups”) over a five-year term. The expenditures, all paid by the landlord, involved a range of items from installation of dry sprinkler systems to lighting and HVAC systems to extensive renovations, including demolition and construction. The cost ranged from $.25 a square foot to $.75 a square foot. The expert calculated a weighted average for tenant improvements of $.40 a square foot per year for five years. On the assumption that some tenant improvements will remain in place and be functional long after the primary tenant vacates the space, i.e., the improvements will last longer than five years, the expert *156 utilized only 50% of Ms weighted average. TMs adjustment resulted in an allowance of $.20 a square foot, wMch he adjusted further to reflect 25% vacancies. Hence, Ms total deduction for the amortized tenant fit-ups amounted to $416,250 (2,775,000 square feet x $.20 per square foot x 0.75 [the area-weighted occupancy rate]).
TMs expense item differs from the unreimbursed expenses in that the latter are ongoing operational items, whereas the tenant improvements are capital in nature the cost of wMch are recovered over a relatively short period of time. Acceptance of the expert’s theory would sanction a mismatch of costs and revenues: economic rent is projected over the remaining useful life of the buildings but tenant improvements are amortized over a period substantially shorter than that. TMs adjustment is conceptually indistinguishable from the absorption period and marketing discounts rejected by this court in Glen Pointe Assocs. v. Teaneck Tp., 10 N.J.Tax 506 (Tax 1989) and Tall Timbers, Inc. v. Vernon Tp., 5 N.J.Tax 299 (Tax 1983) as contrary to Art. VIII, § 1, ¶ 1 of the New Jersey Constitution, which requires that all property be assessed in accordance with uniform rules and a single standard of value.
Accordingly, the court rejects the expert’s tenant improvement amortization.
V.

Inclusion of Tax Factor in the Capitalization Rate.

The law is well settled in tMs State concerning the treatment of local property taxes in tax valuation litigation. When the income approach is used to value property for ad valorem tax purposes, taxes are not deducted as a line item expense in arriving at net operating income. Rather, taxes are accounted for in the capitalization rate through an addition for the effective tax rate. New Brunswick v. State of N.J. Div. of Tax Appeals, 39 N.J. 537, 189 A.2d 702 (1963). The same rule prevails in other jurisdictions. See, e.g., Ames # 82 v. Board of Review of Village of Tupper Lake, 173 A.D.2d 943, 569 N.Y.S.2d 818 (1991) and General Electric Co. *157 v. Board of Assessors of Lynn, 393 Mass. 591, 472 N.E.2d 1329 (1984).
The rule applies, however, to gross leases only, ie., leases whereunder the taxes remain the landlord’s obligation. Where the property in question is subject to a net lease, the tenant paying the taxes (as well as other expenses), a tax factor is not included in the capitalization rate. See Humble Oil & Refining Co. v. Englewood Cliffs, 71 N.J. 401, 403-05, 365 A.2d 929 (Conford, P.J.A.D., concurring, 1976).
Given the way taxes must be handled in property tax cases, ie., as a component of the capitalization rate and not as a line item expense, no taxes are attributable to vacant space as that space, by virtue of the vacancy and loss allowance, is not being valued. Thus, the court finds it inappropriate to include a tax factor in the capitalization rate to the extent of the vacant space.
VI.

The Capitalization Rate.

Both experts utilized the mortgage-equity band of investment method to develop their capitalization rates (exclusive of the tax factor). Plaintiffs expert posits an overall rate of 11%, while defendant’s expert posits 10.5%. Taking into consideration economic conditions, the condition and location of the property and the risks attendant upon ownership of a vast complex of buildings, many of which are more than 70 years old, the court concludes that the capitalization rate developed by plaintiffs expert is the more appropriate.
VII.

Inclusion of the Value of Paving in the Value of the Excess Land.

The parties agreed upon the value and quantum of excess land. They disagreed on the value of the paving. Both experts agreed that the highest and best use of the 48.183 acres of excess land is *158 for further industrial development with a construction of buildings on at least 20 acres thereof. The construction of such improvements will require removal of the existing paving, either to make room for the buildings or because heavy construction vehicles will destroy what is left of the paving. Accordingly, the court concludes that the paving has no value.
In view of the foregoing the court finds the true value of the subject property to be $46,735,000 on October 1, 1988 and $47,-108,500 on October 1, 1989, calculated as follows:
Both years
Gross income—all but Building 40 $ 6,983,685 Less vacancy and loss
allowance (15%) . 1,047,552
Effective gross income— all but Building 40 $ 5,936,133
Gross income—Building 40 $ 505,998 Less vacancy and loss
allowance (20%) 101,200
Effective gross income— Building 40 $ 404,798
Total effective gross income— all buildings 6,340,931
Expenses: [7]
Management—5% $317,046
Leasing 5% 317,046 Unreimbursed
expenses 1,387,500 2,021,592
Net operating income $ 4,319,339
*159 Net operating income capitalized at 11% $39,266,700 (rounded)
Plus excess land 48.183 acres @$155,000/acre 7,468,400 (rounded)
True value $46,735,000
1990
Net operating income capitalized at 11% $39,266,700 (rounded)
Plus excess land—48.183 acres @$162,750/acre 7,841,800 (rounded)
True value $47,108,500
The general average ratios and common level ranges duly promulgated by the Director, Division of Taxation for 1989 and 1990 were:
Lower limit Average ratio Upper limit
1989 52.24% 61.46% 70.68%
1990 42.52% 50.02% 57.52%
The ratio of the 1989 assessment to the 1989 true value as herein found is 75.67%. As this ratio exceeds the upper limit of the common level range plaintiff is entitled, pursuant to N.J.S.A. 54:51A-6, to relief by application of the 1989 ratio of 61.46% to the 1989 true value.
The ratio of the 1990 assessment to the 1990 true value as herein found is 75.33%. As this ratio exceeds the upper limit of the common level range plaintiff is entitled, by virtue of N.J.S.A. *160 54:51A-6, to relief by application of the 1990 ratio to the 1990 true value.
In view of the foregoing judgment will be entered indicating the correct assessments to be as follows:
1989 1990
Land $ 9,636,700 $ 7,877,300
Improvements 19,086,600 15,686,300
Total ' $28,723,300 $23,563,600

 These are a single line item. The parties stipulated at the trial to the assessments for both years and to the elimination of separate land only assessments for Block 294, Lots 8A, 8C, which were set forth on the regular assessment information schedules attached to the complaints for both years.

 An area-weighted occupancy rate refers to the percentage of total leasable space occupied by tenants, irrespective of the rental charge for any particular space. This differs from a dollar-weighted occupancy rate, which reflects the actual rent charged for tenanted space in relation to the estimated rent chargeable for all leasable space including vacant space.

 70% mortgage @11%—25 years constant 11.76% 8.23%
30% equity @10% 3.00%
11.23%
Called 11.00%

 75% mortgage at 10.5% interest—25 years, Constant 11.-
32% 8.50%
25% equity @8% 2.00%
10.50%

 The term "vacant space" as used herein also comprehends unpaid rent by tenants in occupancy. In either case, the landlord must pay that portion of expenses and taxes not paid by a tenant.

 No distinction was made between expenses attributable to vacant space and expenses attributable to occupied space. Arguably, vacant space costs less to maintain; but no proofs were adduced on this issue and the court therefore need not address it.

 The experts differ insubstantially regarding expenses, except for unreimbursed expenses. They both allow 5% for management and 5% for leasing. Defendant’s expert includes reserves in his 15% expense allowance; plaintiff's expert includes reserves in his unreimbursed expenses.