TAX COURT OF NEW JERSEY



**Joshua D. Novin**
**Judge**

**Washington & Court Streets, 1ˢᵗ Fl.**
**P.O. Box 910**
**Morristown, New Jersey 07963**
**Tel: (973) 656-3931 Fax: (973) 656-4305**

NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS

May 16, 2017

Thomas A. Blumenthal, Esq.
143 Main Street
Ridgefield Park, New Jersey 07660

William R. Betesh, Esq.
Boggia & Boggia, L.L.C.
71 Mt. Vernon Street
Ridgefield Park, New Jersey 07660

      Re:     Little Stars Day Care Center v. Village of Ridgefield Park
              Docket No. 014260-2015

Dear Mr. Blumenthal and Mr. Betesh:

This letter constitutes the court's opinion following trial of plaintiff, Little Stars Day Care Center ("plaintiff"), challenge to the 2015 local property tax assessment on its improved property in the Village of Ridgefield Park, County of Bergen, and State of New Jersey.

For the reasons stated more fully below, the court affirms the 2015 tax year local property tax assessment.

## I.     **Procedural History and Factual Findings**

Pursuant to R. 1:7-4, the court makes the following findings of fact and conclusions of law based on the evidence and testimony offered at trial in this matter.

Plaintiff is the owner of the real property and improvements located at 77 Park Street, Ridgefield Park, New Jersey. The property is identified on the municipal tax map of the Village

of Ridgefield Park as Block 61, Lot 8.01 (hereafter referred to as the "subject property"). For the 2015 tax year, the subject property was assessed as follows:

| | |
|---|---|
| Land: | $105,800 |
| Improvements: | $450,100 |
| Total | $555,900 |

The average ratio of assessed to true value, commonly referred to as the Chapter 123 ratio, for the Village of Ridgefield Park ("defendant") was 94.51% for the 2015 tax year. See N.J.S.A. 54:1-35a(a). When the average ratio is applied to the local property tax assessment, the implied equalized value of the subject property is $588,191.73 for the 2015 tax year.

Plaintiff acquired the subject property on April 6, 2010 for reported consideration of $590,000. The subject property is a rectangularly shaped, 0.46-acre lot, containing approximately 57 feet of frontage along Park Street. The subject property is improved with a 3,850 square foot retail/office building containing two finished levels, constructed in approximately 1962. The lower level of the building is partially subterranean and is accessed by staircases located in the entrance vestibule and in the rear of the building, containing approximately 7-8 steps down. The upper level is entirely above grade and is accessed by a staircase in the entrance vestibule, consisting of approximately 7-8 steps. The building is in average condition. The building is entirely occupied by plaintiff, who operates a day care and after school care center for approximately 40 children of varying ages. The lower level of the building contains a small administrative office, a classroom/activities area, an adult lavatory, and a children's lavatory. The lower level also contains a mechanical room. The upper level of the building contains a classroom/activities area, a kitchenette, and a lavatory containing both children and adult fixtures. The interior is finished with a combination of hardwood flooring, vinyl tile, carpeting, plaster

walls, and suspended acoustical tile ceilings. Both levels of the building are sprinklered. The site is serviced by public and private utilities.

The subject property is located in the R-2 Residential Zoning District with permitted uses including single- and two-family residential dwellings. Accordingly, the current use of the subject property as a retail/office building is a pre-existing, legal, non-conforming use.

Plaintiff initially filed a Petition of Appeal challenging the 2015 tax year local property tax assessment on the subject property with the Bergen County Board of Taxation (the "Board"). The Board entered a Memorandum of Judgment affirming the assessment (the "Judgment"). Thereafter, plaintiff timely filed a Complaint with the Tax Court challenging the Judgment. The matter was tried to conclusion over two days.

Plaintiff and defendant each offered testimony from State of New Jersey certified general real estate appraisers, who were accepted by the court, without objection, as experts in the field of property valuation. Plaintiff's appraiser also maintains credentials as a BCA, or business certified appraiser. Each appraiser prepared an appraisal report expressing an opinion of the true market value of the subject property as of the October 1, 2014 valuation date.

During trial, plaintiff sought to introduce opinion testimony from its appraiser/certified business appraiser regarding the going concern value of the former day care center business that occupied the subject property. The court declined to hear such testimony, concluding that plaintiff's appraiser's opinions regarding the business value of the day care center that formerly occupied the subject property, as of April 6, 2010, were neither relevant to nor probative of the fair market value of the subject property as of the October 1, 2014 valuation date in this local property tax appeal. See N.J.R.E. 401.

3

The appraisers offered their opinions that the subject property had a true market value as of the October 1, 2014 valuation date, as follows:

| | |
|---|---|
| Plaintiff's appraiser: | $350,000 |
| Defendant's appraiser: | $670,000 |

## II.     Conclusions of Law

### a.   Rentable or leasable area

One of the principal differences between the appraisers' opinions of value centered on how the two levels of the building should be treated in determining the subject property's value. In plaintiff's appraiser's opinion, the building was a 1,962 square foot retail/office building with a finished basement. Conversely, in defendant's appraiser's opinion, the building was a 3,850 square foot two-story retail/office building. In plaintiff's appraiser's opinion, although plaintiff uses the lower level in furtherance of its day care and after school care business, it is only an "amenity," and should be attributed only a nominal "amenity value." In contrast, defendant's appraiser opined that both the upper and lower levels of the building have separate egress and access, are finished and designed for the use and occupancy of plaintiff, and are actively being used by plaintiff in his day care center business. Thus, in employing the sales comparison and income capitalization approaches to value, plaintiff's appraiser computed values premised on a 1,962 square foot measurement and defendant's appraiser computed values premised on a 3,850 square foot measurement.

In commercial settings, the term gross leasable area has been defined as "the total floor area designed for the occupancy and exclusive use of tenants, <u>including basements</u> and mezzanines." <u>The Appraisal of Real Estate</u>, <u>supra</u>, at 225 (emphasis added). Moreover, the description of an "office building should include measurements of gross building area – finished building area – leasable building area." <u>Ibid.</u> (citing The Building Owners and Managers

Association International, Office Buildings: Standard Methods of Measurement (ANSI/BOMA Z65.1-2010)).

In general, when gauging the rentable or leasable area of a commercial structure, our courts have focused on factors such as the private access to, use of, ability to independently lease, condition and finish of the full or partial subterranean levels. See Berkeley Development Co. v. Berkeley Heights Twp., 2 N.J. Tax 438 (Tax 1981); Shulton, Inc. v. Clifton City, 7 N.J. Tax 208 (Tax 1983); Litton Business Systems, Inc. v. Morris Plains Borough, 8 N.J. Tax 520 (Tax 1986); RTC Properties v. Kearny Town, 13 N.J. Tax 146 (Tax 1993); Pine Plaza Associates, L.L.C. v. Hanover Twp., 16 N.J. Tax 194 (Tax 1996); American Cyanamid Co. v. Wayne Twp., 17 N.J. Tax 542 (Tax 1998); S & R Realty v. Town of Kearny, 20 N.J. Tax 488 (Tax 2001), aff'd, 21 N.J. Tax 105 (App. Div. 2003); Worden-Hoidal Funeral Homes, Inc. v. Red Bank Borough, 21 N.J. Tax 336 (Tax 2001). Moreover, respected treatises have recognized that when "finished basements are used for purposes other than storage and these uses are accepted and typical in the area, they can add significantly to the property's value." The Appraisal of Real Estate, supra, at 244. Thus, the exclusion of leasable, useable or saleable finished areas of a commercial building must be supported by credible evidence. S & R Realty, supra, 20 N.J. Tax at 494.

Preliminarily, the court observes from the exterior photographs of the subject property that the windows serving the upper level of the subject property are situated between the ground level and second floor windows of the immediately adjacent property. In addition, evidence presented during trial revealed that the lower level of the building on the subject property is fully finished, contains an approximately 8' high ceiling, is furnished with heat and air conditioning, contains an adult lavatory, a children's lavatory, an office, overhead fluorescent lighting, finished plaster walls and ceilings, hardwood flooring and is fully sprinklered. Importantly, access to the lower level is

provided by two separate staircases, one located in the front entrance vestibule and the other in the rear of the building. Thus, entry into the lower level does not require entry into the upper level of the building. In sum, the lower level can be independently accessed, is fully finished with a lavatory, is exclusively possessed and used by plaintiff, and materially contributes to plaintiff's overall use of the subject property. Thus, the court concludes that the lower level, and the approximately 1,900 square feet of leasable floor area contained therein, should be ascribed a value in computing the fair market value of the subject property.

### b. Presumption of Validity

At the close of plaintiff's proofs, defendant moved to dismiss plaintiff's Complaint pursuant to R. 4:37-2(b), arguing that plaintiff failed to overcome the presumption of validity. The court concluded plaintiff overcame the presumption of validity, denied defendant's motion and placed a statement of reasons on the record.

However, concluding that the presumption of validity has been overcome does not equate to a finding by the court that a local property tax assessment is erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Township of Edison, 127 N.J. 290, 312 (1992). The court must be mindful that "although there may have been enough evidence [presented] to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the taxpayer. . . to demonstrate that the judgment [or local property tax assessment] under review was incorrect." Id. at 314-15 (citing Pantasote Co. v. City of Passaic, 100 N.J. 408, 413 (1985)).

### c. Highest and Best Use

In the court's pursuit to determine the true market value of the subject property,

6

consideration must be given to that price which a hypothetical buyer would pay a hypothetical seller, neither of which are constrained to purchase or sell the property, as of October 1 of the pretax year. See Petrizzo v. Edgewater, 2 N.J. Tax 197, 200 (Tax 1981); Genola Ventures v. Shrewsbury Bor., 2 N.J. Tax 541, 551 (Tax 1981). An indispensable element to the process of property valuation and to the determination of true market value is discerning a property's highest and best use. Ford Motor Co., supra, 10 N.J. Tax 153, 161 (Tax 1988), aff'd o.b., 12 N.J. Tax 244 (App. Div. 1990), aff'd, 127 N.J. 290 (1992). See also General Motors Corp. v. City of Linden, 22 N.J. Tax 95, 107 (Tax 2005). "For local property tax assessment purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). Thus, the highest and best use analysis is often referred to as "the first and most important step in the valuation process." Ford Motor Co., supra, 10 N.J. Tax at 161.

The highest and best use analysis comprises the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive." Clemente v. Township of South Hackensack, 27 N.J. Tax 255, 267-269 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015). See also County of Monmouth v. Hilton, 334 N.J. Super. 582, 588 (App. Div. 2000).

Here, both appraisers concluded that the "As Improved" highest and best use would be continued use of the subject property as a retail/office building. Defendant's appraiser concluded that the highest and best use of the subject property "As Vacant" would be development consistent with the parameters of the R-2 zone. Conversely, plaintiff's appraiser concluded that the "As Vacant" highest and best use would be "for office/retail development with a variance." However. plaintiff's appraiser conducted no analysis, and offered little evidence in support of his conclusion

that it was reasonably probable a use variance would be granted for the subject property. <u>Linwood Properties, Inc. v. Fort Lee Borough</u>, 7 <u>N.J. Tax</u> 320, 328-29 (Tax 1985).

    d.  <u>Methodology</u>

"There is no single determinative approach to the valuation of real property." <u>125 Monitor Street LLC v. City of Jersey City</u>, 21 <u>N.J. Tax</u> 232, 237-238 (Tax 2004) (citing <u>Samuel Hird & Sons, Inc. v. City of Garfield</u>, 87 <u>N.J. Super.</u> 65, 72 (App. Div. 1965)); <u>ITT Continental Baking Co. v. East Brunswick Township</u>, 1 <u>N.J. Tax</u> 244, 251 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." <u>Brown v. Borough of Glen Rock</u>, 19 <u>N.J. Tax</u> 366, 376 (App. Div. 2001), <u>certif. denied</u>, 168 <u>N.J.</u> 291 (2001) (internal citation omitted)). The "decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." <u>Coca-Cola Bottling Co. of New York v. Neptune Township</u>, 8 <u>N.J. Tax</u> 169, 176 (Tax 1986) (citing <u>New Brunswick v. Tax Appeals Div.</u>, 39 <u>N.J.</u> 537 (1963)). <u>See also</u> <u>WCI-Westinghouse, Inc. v. Edison Township</u>, 7 <u>N.J. Tax</u>, 610, 619 (Tax 1985), <u>aff'd</u>, 9 <u>N.J. Tax</u> 86 (App. Div. 1986).

Here, both plaintiff's appraiser and defendant's appraiser employed the sales comparison and income-capitalization approaches to value the subject property. Plaintiff's appraiser attributed equal weight to the sales comparison and income capitalization approaches. Defendant's appraiser attributed more weight to the sales comparison approach because the subject property is owner occupied, and is operated for single tenant use.

### 1. Sales Comparison Approach

The sales comparison approach derives an opinion of market value "by comparing properties similar to the subject property that have recently sold, are listed for sale, or are under contract." Appraisal Institute, The Appraisal of Real Estate 377 (14th ed. 2013). This approach requires the appraiser to engage in a "comparative analysis of properties" and to focus on the "similarities and differences that affect value. . . which may include variations in property rights, financing, terms, market conditions and physical characteristics." Id. at 378.

#### a. Plaintiff's appraiser

Plaintiff's appraiser identified six multi-tenanted, mixed-use buildings in Bergen County that sold between August 2012 and May 2014, which he deemed comparable. The unadjusted sale prices of the six sales ranged from $300,000 to $410,000, or $118.46 to $184.66 per square foot. Plaintiff's appraiser applied adjustments to the sales to account for perceived differences in location and age/quality/condition. Plaintiff's appraiser made no adjustment to account for the presence of a fully finished and useable lower level on the subject property. The adjusted sale prices ranged from $124 to $185 per square foot. The appraiser's analysis yielded a fair market value conclusion of $175.00 per square foot.

Plaintiff's appraiser then applied the $175.00 value to the 1,962 square feet of the upper level of the building on subject property, to arrive at his concluded value of $350,000 (1,962 x $175.00 = $350,000), as of the October 1, 2014 valuation date. Plaintiff's appraiser attributed no value to the approximately 1,900 square feet of finished area in lower level of the building.

#### b. Defendant's appraiser

Defendant's appraiser identified four sales of day care centers in Bergen County, New Jersey, that sold between April 2010 and August 2014, which he deemed comparable.

9

Defendant's appraiser utilized the subject property's sale in April 2010 as a comparable sale. The unadjusted sale prices of the four sales ranged from $387,500 to $925,000, or $144.49 to $183.74 per square foot. Defendant's appraiser applied adjustments to the sales to account for perceived differences in location and parking. Defendant's appraiser made a downward sale condition adjustment to the subject property's sale to account for what he termed "Assets - $35,000."[1] The adjusted sale prices of the four transactions ranged from $144.49 to $175.97 per square foot. Ultimately, defendant's expert concluded a fair market value of $175.00 per square foot. Defendant's expert then applied the $175.00 value to the square footage of both the lower and upper levels of the subject property, which he calculated as 3,850 square feet. Thus, defendant's appraiser concluded the subject property had a value of $673,800 (3,850 x $175.00 = $673,800), as of the October 1, 2014 valuation date.

### c. Conclusion

When employing the sales comparison approach, appraisers must adhere to "systematic procedure[s]." The Appraisal of Real Estate, supra, at 381. Appraisers must conduct research of the competitive marketplace for "information on properties that are similar to the subject property" and that have recently sold. Ibid. A crucial element of this investigation and research involves the data verification process. An appraiser must verify the integrity of the information by "confirming that the data obtained is factually accurate and that the transactions reflect arm's-length market considerations." Ibid. During the data verification process an appraiser must "elicit additional information about the property such as buyer motivation, economic characteristics, [and] value component allocations. . . to ensure that comparisons are credible." Ibid. The process demands an

---

[1]Evidence was presented during trial, including the HUD-1 Settlement Statement and Contract for the Purchase of Real Property and Retail Business revealing that the subject property sold for $590,000, and that plaintiff paid the seller the additional sum of $35,000 for the day care center business, including furniture, fixtures and equipment. Thus, defendant's appraiser's downward adjustment of $35,000 for "Assets" was inappropriate.

appraiser "verify information with a party to the transaction to ensure its accuracy and gain insight into the motivation behind each transaction." Id. at 385. An appraiser must endeavor to confirm "statements of fact with the principals to the transaction. . . or with brokers, closing agents, or lenders involved." Ibid.

Here, plaintiff's appraiser's investigation, analysis and conclusions suffer from flaws that are fatal to their credibility and reliability. Five of the sales relied on by plaintiff's appraiser were mixed-use, multi-tenanted properties (retail/residential and office/residential). Conversely, the subject property is entirely a retail/office/day care center; no residential component exists on the subject property. "Evidence of comparable sales is effective in determining value only where there is a substantial similarity between the properties." Venino v. Borough of Carlstadt, 1 N.J. Tax 172, 175 (Tax 1980), aff'd o.b. 4 N.J. Tax 528 (App. Div. 1981); See also Bloomfield Associates v. Bloomfield Town, 12 N.J. Tax 501 (Tax 1992); Glenpointe Assocs. v. Township of Teaneck, 241 N.J. Super. 37, 48 (App. Div. 1990), certif. denied, 122 N.J. 391 (1990). Moreover, thorough cross-examination revealed that plaintiff's appraiser was seemingly unaware that the listing for his comparable sale 2, the only retail/office building contained among his six sales, disclosed that the seller was unusually motivated and wanted to divest itself of the property due to relocation.

Plaintiff's appraiser was similarly unaware if any of his six comparable sales contained partial basements or subterranean levels. "Evidence of comparable sales is effective in determining value of property for purposes of taxation only where there is a substantial similarity between the properties so as to admit of reasonable comparison." Berkeley Development Co., supra, 2 N.J. Tax at 443 (citing Erie R. System v. Walsh, 26 N.J. Misc. 81, 93 (Div. Tax. App. 1948)).

Plaintiff's appraiser did not know if the any of the sales transactions were subject to long-term lease agreements or were sold vacant and free of all tenants. Similarly, if any of the sale

11

transactions were sold subject to long-term lease agreements, plaintiff's appraiser was unaware of the lease terms and whether the leases were at market rates. "[A] period of vacancy of the property may create a greater incentive to sell the property under duress for a price that is lower than market value." 125 Monitor Street LLC, supra, 21 N.J. Tax at 242.

Plaintiff's appraiser could not explain why his comparable sale 3 was reported as being in escrow for a period of 365 days. Plaintiff's appraiser was seemingly unaware that his comparable sale 5 was a private sale. Moreover, effective cross-examination revealed that plaintiff's appraiser did not verify the terms of comparable sale 5 with any transaction participants.

Although plaintiff's appraiser maintained that he or a member of his staff verified the terms of each sale transaction, the failure of such investigation to disclose meaningful details about each transaction that could have materially affected the reported sales price, raises questions regarding the veracity with which such investigation was performed. Thus, plaintiff's appraiser's lack of detailed knowledge about the comparable sale transactions and failure to verify basic transaction terms, including the unusual motivations of the parties casts doubt on the accuracy and integrity of the sales data relied upon by plaintiff's appraiser.

Additionally, plaintiff's adjustments lacked any credible foundation supported by objective data or market derived sources. Plaintiff's appraiser concluded that the demographics of his comparable sale 2 and comparable sale 4 were "inferior" to the demographics of the subject property and thus, he made a 10% upward adjustment to those comparable sales. However, plaintiff's appraiser could not identify any difference that existed in the demographics between the two municipalities, much less explain how any perceived difference specifically warranted a 10% adjustment. Moreover, although plaintiff's appraiser opined that his comparable sales 1, 3 and 5

warranted upward adjustments of 5% for age/condition/quality, plaintiff's appraiser did not inspect the comparable sales and was unfamiliar with their interior condition.

Plaintiff's appraiser further testified that he performed a "paired data analysis," however, his data set and analysis was not contained in the appraisal report or in any addendum thereto. Thus, the information and data he examined and relied upon in conducting such paired data analysis was not available for the court's review.

It is a well-settled principle that an expert's opinion must be grounded in "facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts." Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2007) (quoting State v. Townsend, 186 N.J. 473, 494 (2006)).  The opinion of an expert must be supported by a proper foundation and based upon credible facts and data. Peer v. City of Newark, 71 N.J. Super. 12, 21 (App. Div. 1961), certif. denied, 36 N.J. 300 (1962).  N.J.R.E. 703 requires that an expert's opinion be based on facts, data, or another expert's opinion, either perceived by or made known to the expert, at or before trial.  Buckelew v. Grossbard, 87 N.J. 512, 524 (1981); Nguyen v. Tama, 298 N.J.Super. 41, 48-49 (App. Div. 1997).

The weight to be accorded expert testimony "depends upon the facts and reasoning which form the basis of the opinion.  An expert's conclusion can rise no higher than the data providing the foundation (citation omitted).  If the bases for the adjustments are not made evident the court cannot extrapolate value." Inmar Associates v. Edison Township, 2 N.J. Tax 59, 66 (Tax 1980). Thus, in order for the opinion of an expert to be of any value to the trier of fact, the expert is required to "identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are scientifically reliable." Landrigan

v. Celotex Corp., 127 N.J. 404, 417 (1992). "Without explanation as to the basis, the opinion of the expert is entitled to little weight…" Dworman v. Tinton Falls Borough, 1 N.J. Tax 445, 458 (Tax 1980) (citing to Passaic v. Gera Mills, 55 N.J. Super. 73 (App. Div. 1959), certif. denied, 30 N.J. 153 (1959)).

Here, plaintiff's appraiser's lack of knowledge of critical factual details of his comparable sales transactions, which formed the basis of his opinions, produces an unreliable and untrustworthy result. Moreover, plaintiff's appraiser failed to offer a reasonable explanation or basis for his adjustments, rooted in objective market data. In sum, plaintiff's appraiser has not furnished the "why and wherefore" supporting his sales comparison approach conclusion of value for the subject property.

The court's review of defendant's analysis produces a more credible, albeit an imperfect result. As stated above, defendant's appraiser's comparable sales 1 and 2 were effectuated in April 2010 and August 2010. Thus, these sales were effectuated approximately four years prior to the October 1, 2014 valuation date involved herein. These sales were too remote in time to provide meaningful evidence to the court of the fair market value of the subject property as of the October 1, 2014 valuation date. Accordingly, the court attributes no weight to defendant's comparable sales 1 and 2. See Little Ferry Borough v. Vecchiotti, 7 N.J. Tax 389 (Tax 1985); Newport Center v. Jersey City, 17 N.J. Tax 405 (Tax 1998).

Conversely, the court finds defendant's appraiser's comparable sale 3 and comparable sale 4 more credible evidence of value. Comparable sale 3 and comparable sale 4 were arms-length transactions, selling within approximately 2 months of the October 1, 2014 valuation date; the sales involved day care facilities located in Bergen County; and the age and condition of the buildings were substantially similar to the age and condition of the building on the subject property.

After making a 5% downward adjustment to these sales to account for the presence of on-site parking, and a 5% downward adjustment to sale 4 for location, defendant's appraiser's range of value for these sales was $174.55 to $175.97. Thus, the court concludes that defendant's appraiser's derived value of $175.00 for the upper level of the building on the subject property is supported by the record.

However, neither plaintiff's appraiser nor defendant's appraiser furnished the court with any objective market data, comparable sales, meaningful testimony or evidence as to the value which should be ascribed to the lower level of the building on the subject property. In plaintiff's appraiser's opinion, the lower level possesses only "amenity value." Conversely, defendant's appraiser opined that the lower level and upper level of the building should be valued identically. The court concludes that the record before the court fails to support either appraiser's opinion in this regard. None of the comparable sales offered by plaintiff's appraiser or defendant's appraiser contained full or partial subterranean levels, let alone, fully finished lower levels with bathrooms and a separate means of egress and access. Thus, no comparable sales were offered by either plaintiff's or defendant's appraiser with respect to how the market would value a retail/office property possessing such characteristics. Without this critical market data and information, it is impossible for the court to reach a conclusion of the true value of the subject property employing the sales comparison approach. Any reduced value per square foot that the court would ascribe to the lower level of the building on the subject property would be mere speculation and conjecture, unsupported by market evidence.

Accordingly, for the above stated reasons, the court must reject both plaintiff's and defendant's appraisers' conclusions of the fair market value of the subject property under the sales comparison approach.

2. Income Capitalization Approach

When a property is income-producing, the preferred method for determining the estimated market value of that property is the income capitalization approach. Parkway Village Apartments Co. v. Township of Cranford, 8 N.J. Tax 430 (Tax 1985), aff'd, 9 N.J. Tax 199 (App. Div. 1986), rev'd on other grounds, 108 N.J. 266 (1987); Helmsley v. Borough of Fort Lee, 78 N.J. 200 (1978); Hull Junction Holding Corp. v. Borough of Princeton, 16 N.J. Tax 68, 79 (Tax 1996). "The income capitalization approach to value consists of methods, techniques, and mathematical procedures that an appraiser uses to analyze a property's capacity to generate benefits (i.e., usually the monetary benefits of income and reversion) and convert these benefits into an indication of present value." The Appraisal of Real Estate, supra, at 439. Critical to the income capitalization approach is the appraiser's scrutiny, evaluation and analysis of data, information, statistics, costs, and a property's capacity to generate future benefits in order to determine the "'market rent' or fair rental value'" of a property. Parkway Village Apartments Co., supra, 108 N.J. at 270. See also New Brunswick v. State Div. of Tax Appeals, 39 N.J. 537 (1963).

Expressed as a formula, the income capitalization approach can be best summarized as follows:

$$
\begin{array}{ll}
 & \text{Market Rent} \\
\text{x} & \underline{\text{Rentable Square Footage}} \\
 & \text{Potential Gross Income} \\
\\
\text{-} & \underline{\text{Vacancy and Collection Losses}} \\
 & \text{Effective Gross Income} \\
\\
\text{-} & \underline{\text{Operating Expenses}} \\
 & \text{Net Operating Income} \\
\\
\div & \underline{\text{Capitalization Rate}} \\
 & \text{Market Value of Property}
\end{array}
$$

a.  Plaintiff's appraiser

In performing his income capitalization approach, plaintiff's appraiser identified eight rental properties with proposed "move-in" dates between April 2012 and July 2014.  Plaintiff's appraisal report states that he "analyzed actual leases where available" and "[w]hen details of actual leases were not available, we utilized asking rents. . ."

Effective cross-examination revealed that four of the eight leases submitted by plaintiff were lease offers or asking rents and not consummated leases.  It is well-settled that lease offers or asking rents are unreliable indicators of market rental value.  This is because they "represent only one half of the necessary equation," that is to say, a willing landlord but no willing tenant. Korvettes Home Furnishing Ctr. v. Borough of Elmwood Park, 1 N.J. Tax 287, 291 (Tax 1980). Moreover, because asking rents are subject to continued negotiation and change until a lease is actually consummated, they are not "evidentiary and may not be considered in determining a property's economic rent" or market rent. Harrison Realty Corp. v. Township of Harrison, 16 N.J. Tax 375, 381-83 n.3 (Tax 1997) (citations omitted), aff'd, 17 N.J. Tax 174 (App. Div. 1997), certif. denied, 153 N.J. 213 (1998). See also Lamm Assocs. v. Borough of Caldwell, 1 N.J. Tax 373, 379 (Tax 1980).  Thus, plaintiff's appraiser's consideration of the four asking rents in his income capitalization approach was inappropriate.  Accordingly, the court accords no weight to plaintiff's four asking rents in attempting to discern the market rent for the subject property.

Of the four remaining leases, three were identified as modified gross leases and one was identified as a triple net lease.  Plaintiff's appraiser was unaware whether any of the comparable leases contained basements or subterranean areas.  In plaintiff's appraiser's opinion, a triple net lease arrangement for the subject property would be most appropriate because it would most likely be occupied by a single tenant, and single tenants tend to rent property on a triple-net basis.  Thus,

17

plaintiff's appraiser adjusted the modified gross leases downward by $3.50 per square foot to account for what he characterized as an amount that "typically accounts for the property owner paying property taxes and insurance." However, cross-examination revealed a lack of any data and support for plaintiff's appraiser's adjustment amount. Plaintiff's appraiser did not investigate the real estate taxes attributable to the comparable leases and had no information or studies to support his insurance cost estimates or other expenses of the properties. In response to requests for support for this adjustment amount, defendant's appraiser summarily responded that "if we had to have all that [expense] information we wouldn't get too many appraisals done."

The unadjusted per square foot rental values attributable to the remaining four comparable leases ranged from $15.00 to $25.00 per square foot. The adjusted values of the comparable leases ranged from $15.00 to $21.50 per square foot. Ultimately, plaintiff's appraiser concluded a market rent value of $17.00 per square foot for the 2015 tax year.

In order to reach his conclusion of value, plaintiff's appraiser multiplied his market rent by the square footage of the upper level of the building on the subject property. This resulted in a Potential Gross Income of $33,354 ($17.00 x 1,962 = $33,354). Plaintiff's appraiser attributed no market rent value to the approximately 1,900 square feet of the lower level of the building. Plaintiff's appraiser then deducted a vacancy and collection loss factor (7%) to derive an Effective Gross Income of $31,019. Plaintiff's appraiser applied operating expenses for management fees (4%), "repairs & reserves" (5%) and "general & administrative" expenses at "$1.00 per square foot," applied only to the square footage of the upper level of the building. This produced an estimated Net Operating Income of $26,265. Plaintiff's appraiser then employed the band of investment technique utilizing a mortgage interest rate of 5.25%, loan amortization term of 20 years, loan-to-value ratio of 75% and equity rate of 5.80% to derive an overall capitalization rate

of 7.50%.  Finally, the appraiser applied the capitalization rate to the Net Operating Income figure to reach his concluded opinion of value for the subject property of $350,000, as of the October 1, 2014 valuation date.

b.  Defendant's appraiser

Defendant's appraiser, on the other hand, researched lease transactions, selecting those lease transactions that he deemed most competitive.  Defendant's appraiser identified four leases of retail buildings he considered reflective of market rent for the subject.  Defendant's appraiser explained that day care centers are "quantified as retail use" in the subject market and fit within the category of retail properties under The Dictionary of Real Estate Appraisal.  Three of the leases were of day care and child care centers, the remaining lease was for a martial arts studio.  The unadjusted per square foot rental values attributable to the four comparable leases ranged from $16.43 to $31.97 per square foot.  Defendant's appraiser applied adjustments to the comparable leases, accounting for differences in: size, building type, physical condition, parking, visibility and lease type.  In defendant's appraiser's opinion, a modified gross lease arrangement for the subject property would be more appropriate because "daycare centers are leased on a modified gross lease basis. . ."  Thus, defendant's appraiser adjusted the comparable net leases upward by 15% to account for the landlord's contribution for "some, but not all of the property's fixed expenses. . ."  The adjusted values of the comparable leases ranged from $18.07 to $24.31 per square foot.  Defendant's appraiser ultimately concluded a market rent value of $21.00 per square foot for the 2015 tax year.

In order to reach his conclusion of value, defendant's appraiser multiplied his market rent by the square footage of both the upper and lower levels of the building on the subject property.  In contrast to plaintiff's appraiser, defendant's appraiser attributed the identical market rent value

19

to both the lower and upper levels of the building on the subject property. This resulted in a Potential Gross Income of $80,850 ($21.00 x 3,850 = $80,850). Thereafter, defendant's appraiser deducted a vacancy and rent loss factor (10%) to derive an Effective Gross Income of $72,765. Defendant's appraiser then applied operating expenses for management fees (5%), real estate commissions (3%) and reserves of $1.00 per square foot. This produced an estimated Net Operating Income of $63,094. Defendant's appraiser then employed the band of investment technique utilizing a mortgage interest rate of 4.20%, loan amortization term of 25 years, loan-to-value ratio of 70% and equity rate of 6.00% to derive a capitalization rate of 6.30%. Defendant's appraiser then weighted the capitalization rate by adding the effective tax rate (3.355) to the capitalization rate to determine an overall capitalization rate of 9.66% (3.355 + 6.30% = 9.66%). Finally, defendant's appraiser applied the overall capitalization rate to the Net Operating Income to reach his concluded opinion of value for the subject property of $650,000, as of the October 1, 2014 valuation date.

### c. Conclusion

The court finds comparable leases 2, 3 and 4, offered by defendant's appraiser to be the most credible evidence of market rent. The primary reason for this determination is that defendant's appraiser reviewed lease abstracts or lease agreements for each of these comparable leases and confirmed the information on these abstracts with transaction participants. In addition, comparable leases 2, 3 and 4 were competitive day care center or retail property leases in the Bergen County marketplace entered into between April 2012 and April 2014, dates in reasonably close in proximity to the October 1, 2014 valuation date. Moreover, defendant's appraiser furnished satisfactory explanations for his building type, parking and visibility adjustments. Defendant's appraiser credibly testified that he performed an interior inspection of comparable

lease 2, substantiating his conditions adjustment. However, the court accords no weight to defendant's comparable lease 1, as that lease was consummated in February 2009, approximately five years prior to the October 1, 2014 valuation date and thus, is too remote in time to be a reliable indicator of market rent.

Conversely, the comparable leases offered by plaintiff's appraiser were less credible. Cross-examination revealed that plaintiff's appraiser did not review or have in his possession a copy of any of the lease agreements. Instead, plaintiff's appraiser concluded a market rent value premised on lease information, including the leased square footage, lease terms and lease type, gathered from the Garden State Multiple Listing Service, CoStar and LoopNet.[2] Although plaintiff's appraiser initially averred to a data verification process with the real estate brokers, continued cross-examination revealed the brokers he attempted to contact were not responsive. Additionally, in response to the court's questions regarding the accuracy of the multiple listing service information, defendant's appraiser responded, "unless we have appraised the property or it's a broker that we have an existing relationship with, or that we have done business with before that doesn't mind sharing private information with us, we just don't have it." Thus, plaintiff's appraiser did not properly scrutinize, evaluate or analyze the comparable lease data; a fundamental prerequisite to determination of market rent and performing the income capitalization approach. See Parkway Village Apartments Co., supra, 108 N.J. at 270. Accordingly, the accuracy, correctness and completeness of plaintiff's appraiser's comparable leases are suspect.

Thus, the court finds defendant's appraiser's concluded value of $21.00 per square foot, on a modified gross lease basis, more credible evidence of the market rent attributable to the upper level of the building on the subject property for the 2015 tax year. However, that does not lead

---

[2] CoStar provides information and analytic services for commercial real estate customers and brokers. LoopNet provides marketing, advertising and real estate listing services for commercial real estate customers and brokers.

the court to conclude that a market rent of $21.00 per square foot should be attributable to the lower level of the building on the subject property.

As stated above, plaintiff's appraiser attributed no market rent value to the lower level of the building on the subject property. In the opinion of plaintiff's appraiser, the lower level was not independently marketable, "basement space doesn't rent for the same as regular space," and the lower level merely constituted an amenity of the upper level. Nonetheless, the court observes that none of the comparable leases submitted by plaintiff's appraiser shared this distinct amenity and physical characteristic. Moreover, plaintiff's appraiser failed to make any adjustment to his comparable leases to account for the value which should be attributed to this so-called amenity. Thus, the leases submitted by plaintiff's appraiser were not truly competitive with and comparable to the subject property in the marketplace. Conversely, defendant's appraiser attributed full market rent value to the lower level of the building on the subject property. In the opinion of defendant's appraiser, because the lower level of the building was finished and being used by plaintiff in his day care business, it should be ascribed market rental value. However, none of the four comparable leases offered by defendant's appraiser included any basement or lower levels. Thus, defendant's appraiser did not furnish the court with any comparable or competitive leases that ascribed a market rent to a subterranean or lower level. Accordingly, neither plaintiff's or defendant's appraiser furnished the court with evidence that the lower level of the subject property should be ascribed: (i) an equivalent market rent to the upper level, (ii) a lower market rent than the upper level, or (iii) no market rent, because the upper level rent will reflect the additional "amenity value" of the lower level.

The court readily observes that physical characteristics result in the two levels not being equivalent to one another (i.e. the lower level is partially subterranean and contains no windows,

22

while the upper level is above grade and has windows). It is well settled that factors which influence the value of retail and office space include "physical characteristics such as the visibility, attractiveness, quality of construction, and condition of properties" and the "character and location of existing or anticipated competition." The Appraisal of Real Estate, supra, at 176-77. However, neither appraiser appropriately accounted for the differences in physical characteristics that exist between the upper and lower levels. These differences shape the market value to be attributed to the subject property. Thus, the manner or capacity of the lower level of the subject property to generate income, a critical component of the income capitalization approach, was not adequately addressed by plaintiff's appraiser or defendant's appraiser.

The court is mindful of its duty "to apply its own judgment to valuation data submitted by experts in order to arrive at a true value and find an assessment for the years in question." Glen Wall Associates v. Wall Twp., 99 N.J. 265, 280 (1985) (citing New Cumberland Corp. v. Roselle Borough, 3 N.J. Tax 345, 353 (Tax 1981)). Moreover, the court acknowledges that "[t]he judges presiding in the Tax Court have special expertise" in matters of property valuation and taxation. Glenpointe Assoc. v. Township of Teaneck, 241 N.J. Super. 37, 46 (App. Div.), certif. denied, 122 N.J. 391 (1990). However, in order to permit the court to apply its own judgment and make a finding of market rent, credible and objective evidence of comparable and competitive leases in the marketplace must be presented. Here, such evidence was not furnished by plaintiff or defendant.

Without this necessary objective data and information, the court is unable to discern the market rent that should be ascribed to the lower level of the building on the subject property, if any. Therefore, the court is unable to derive an estimate of value for the subject property using the income capitalization approach.

**III.     Conclusion**

For the above stated reasons, the court concludes that plaintiff has failed to prove, by a fair preponderance of the evidence, that the local property tax assessment on the subject property exceeds its true value.   Additionally, the court further concludes that defendant has failed to provide credible and competent evidence establishing the true value of the subject property.

Accordingly, the court will enter judgment dismissing plaintiff's Complaint.

Very truly yours,


/s/ Hon. Joshua D. Novin, J.T.C.